UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| CareFirst of Maryland, Inc. | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | | Case No.: __1:26-cv-2391__ |
| | * | |
| AVRAHAM RAPPAPORT, ELIEZER RAPPAPORT, and JOHN DOES 1-20 | * | Jury Trial Demanded |
| | * | |
| Defendants. | * | |

**COMPLAINT**

Plaintiff CareFirst of Maryland, Inc. ("CareFirst"), by and through its undersigned attorneys, hereby bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, as well as state law causes of action, against Defendants Avraham Rappaport, Eliezer Rappaport, and their co-conspirators, John Does 1-20, and state as follows:

**NATURE OF THE CASE**

1.      CareFirst of Maryland, Inc., a non-profit health insurance provider based in Baltimore, Maryland, is the victim of a health insurance fraud conspiracy of breathtaking scale and audacity.

2.      For years, beginning in 2018 but not known to CareFirst until late 2022, Avraham Rappaport, an insurance broker based in Olney, Maryland, his brother Eliezer Rappaport (the

1

"Rappaports"), stood at the forefront of an international conspiracy, involving numerous others, to defraud CareFirst and cause CareFirst losses of more than $50 million.

3.    Utilizing fraudulent identities, fake residences, an international network of referrals, and the assistance of individuals and numerous entities, the Rappaports coordinated an international insurance-fraud machine. In doing so, the Rappaports directly committed or directed others to commit numerous violations of federal and state law to both effectuate and conceal their illegal activities.

4.    The Rappaport machine's goal was simple: to get CareFirst to pay out claims to the Rappaports' overseas and out-of-state clients for high-end medical treatments that the Rappaports knew those clients were ineligible to receive. The Rappaports achieved this by submitting fraudulent insurance policy applications that falsely claimed the Rappaports' clients were Maryland residents.

5.    CareFirst has offered health insurance policies created exclusively for the benefit of Maryland residents, which allow Maryland residents to receive generous coverage for services anywhere in the United States. Under these policies, for example, if a Maryland resident covered by the policy needed to receive treatment from a top specialist for a rare condition in California, that treatment would be covered by CareFirst. The Rappaports' scheme took advantage of this aspect of CareFirst's business.

6.    The Rappaports understood that there was a market outside of Maryland and even abroad for CareFirst's nationwide coverage available to Maryland residents. To manufacture the appearance of Maryland residency for their clients, the Rappaports utilized a network of property owners, service providers, charities, and overseas referrers to create a pipeline for out-of-state and overseas individuals to get CareFirst to pay their claims for high-end medical treatment.

2

7.      The Rappaports' network utilized a series of properties in the Baltimore area owned or controlled by the Rappaports and their associates, which they listed as their clients' Maryland "residence" on insurance coverage applications. The Rappaports did this hundreds of times over the course of multiple years. When they were challenged, the Rappaports directed their clients to submit falsified documents to CareFirst as "support" for their fraudulent residency claims. Upon information and belief, the Rappaports also directed and assisted their overseas clients to submit false information in connection with their visa applications to the United States.

8.      The Rappaports' scheme relied upon numerous other entities and individuals to provide referrals, transportation, lodging, material support, and documentation to their clients to make the scheme possible and shield it from outside scrutiny. Upon information and belief, some of the entities the Rappaports relied upon were charities and religious organizations. The Rappaports' reliance on these organizations, even if they were not knowing participants, served to lend legitimacy to the Rappaports' illegal conduct and shield it from scrutiny.

9.      Thus, the Rappaport enterprise was an intricate, international conspiracy that caused losses in excess of $50 million to CareFirst, and netted hundreds of thousands of dollars in commissions from CareFirst for "selling" these fraudulent policies. Upon information and belief, the Rappaports also received compensation from the out-of-state subscribers for submitting the fraudulent applications on their behalf.

10.     The Rappaport conspiracy is thus not a small-scale, one- or two-off healthcare fraud. For the conspiracy to work—as it surely did—it required many individuals, entities, and organizations, to work in concert at the direction of the Rappaports.

11.     Indeed, it seems that fraud has become something of a family tradition for the Rappaports. Shortly before this Complaint was filed, the Rappaports' other brother, Jacob, pleaded guilty to bank fraud related to real estate transactions in Baltimore.

12.     The Rappaport conspiracy against CareFirst was successful. There can be no doubt about that. The Rappaports caused CareFirst to pay more than $50 million to out-of-state individuals under policies reserved for Maryland residents, even as the Rappaports reaped large commissions from CareFirst for "selling" those fraudulent policies.

13.     The Rappaports' scheme is precisely the type of conspiracy that the RICO statute was designed to combat. CareFirst seeks relief under this statute for the multitude of injuries the Rappaports and their co-conspirators inflicted upon it.

**PARTIES**

14.     Plaintiff CareFirst of Maryland, Inc. is a not for profit corporation and provider of health insurance products to consumers. CareFirst is registered in Maryland and headquartered in Baltimore, Maryland. CareFirst employs more than 3,500 individuals in the State of Maryland and provides insurance coverage to millions of people, most of whom reside in its primary service area in Maryland, the District of Columbia, and Virginia.

15.     Defendant Avraham Rappaport ("Avraham") resides in Montgomery County, Maryland. Avraham was, during the conduct described in this Complaint, a licensed insurance broker in Maryland. Upon information and belief, Avraham's insurance brokerage license was revoked by the Maryland Insurance Administration, largely because of the misconduct alleged in this Complaint.

16.     Defendant Eliezer Rappaport ("Eliezer") resides in Baltimore County, Maryland. Upon information and belief, Eliezer is a registered financial advisor. He was also at some point

during the events described herein, a licensed insurance broker in Maryland. Upon information and belief, Eliezer's insurance brokerage license was suspended, largely because of the misconduct described in this Complaint.

17.    John Does 1-20 are the Rappaports' as-yet unmasked co-conspirators.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under a federal law, the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962, 1964).

19.    Personal jurisdiction over Defendants is proper as Avraham and Eliezer Rappaport are citizens of the State of Maryland, reside herein, and reside in this District. The events giving rise to the causes of action in the Complaint also took place in this District.

20.    Venue is proper under 28 U.S.C. § 1391 as it is the District where Defendants reside and the District in which a substantial part of the events alleged herein occurred.

## FACTUAL ALLEGATIONS

**A.    CareFirst's Business**

21.    CareFirst is one of the country's largest not for profit healthcare organizations. Its service area includes Maryland, Washington, D.C., and portions of northern Virginia.

22.    As part of its business, CareFirst offers health benefit plans to individuals residing in the State of Maryland ("Maryland health insurance policies").

23.    Among other channels, CareFirst's Maryland health insurance policies are sold through the Maryland Health Benefit Exchange ("MHBE") (a state-based marketplace established in compliance with the Affordable Care Act) directly by CareFirst itself, and, relevant here, by

5

third-party brokers with whom CareFirst contracts to sell its policies. These third-party brokers may sell policies through the MHBE (on the Exchange) or otherwise (off Exchange).

24.    Whether sold through the MHBE or not, both Maryland law and CareFirst policy require that individuals seeking insurance coverage under CareFirst's Maryland health insurance policies reside in the State of Maryland. *See, e.g.*, Md. Code, Insurance Art. § 31-108 (establishing that the MHBE shall exist to make qualified health insurance plans available to Maryland residents); COMAR 14.35.07.07 (establishing residency requirements for individuals applying for health insurance on the MHBE).

**B.    The Rappaports' Relationship with CareFirst**

25.    Avraham Rappaport, the leader of the Rappaport enterprise and chief architect of the conspiracy described herein, was an insurance broker, previously licensed by the State of Maryland to purchase and sell insurance on behalf of companies like CareFirst, both on the MHBE and off the Exchange. Avraham sold hundreds of CareFirst policies. As it turned out, many of the policies Avraham "sold," were to Avraham's out-of-state clients. Avraham knew these clients were ineligible to receive the applied-for policies, yet he provided and submitted knowingly false information to make it appear to CareFirst and Maryland regulators that his clients were eligible when they were not.

26.    Eliezer Rappaport, Avraham's brother, is a financial advisor and was formerly a licensed insurance broker in the State of Maryland. Eliezer was the broker of record on at least one insurance policy application submitted to CareFirst on behalf of an individual who was ineligible to receive the applied-for policy.

27.    The Rappaports' business address is 101 E. Chesapeake Avenue, Suite 203, Towson, MD 21286.

28.    Upon information and belief, this is also the business address of the financial advisory firm where both brothers worked for at least some time during the relevant period. It is not currently known if this financial advisory firm is or was involved in the Rappaports' insurance fraud enterprise.

29.    From 2016 to 2023, CareFirst and the Rappaports were parties to agreements governing Avraham's sale of CareFirst's health insurance benefit plans (the "Broker Agreements"). Each agreement includes substantially identical language.

30.    The Broker Agreements permitted the Rappaports to sell CareFirst's Maryland health insurance policies both through the MHBE and off the Exchange.

31.    The Broker Agreements explicitly required the Rappaports to "accurately and completely facilitate" the enrollment of beneficiaries, and to "verify and confirm the eligibility of all persons applying for enrollment."

32.    The Broker Agreements further required the Rappaports to comply with all "Federal, State, and local laws," including the requirements of any Federally- or State-Facilitated Exchanges, and to follow CareFirst's requirements, standards, and procedures, including those in its Agent Administrative Manual and Contractor Code of Ethical Business Conduct and Compliance (the "Code").

33.    During the six-year period in which he was authorized to sell CareFirst's Maryland health insurance policies, the Rappaports sold nearly 1,000 such policies, leading CareFirst to pay out millions of dollars in claims for the beneficiaries of such policies.

34.    As shown below, many of the policies the Rappaports sold were part of a carefully orchestrated conspiracy to defraud CareFirst.

**C.    The Rappaports' Fraud Scheme**

35.     The Rappaports organized a criminal scheme against CareFirst that had a simple goal but required a broad network to implement successfully.

36.     CareFirst offers health insurance policies that provide generous nationwide healthcare coverage. Crucially, as required by Maryland law, some of these policies, relevant here, are available exclusively for the benefit of Maryland residents. The relevant policies provide comprehensive, nationwide coverage, allowing Maryland-resident subscribers to receive the medical care they need regardless of whether that care is available in Maryland or out of state.

37.     The Rappaports, as licensed Maryland insurance brokers, understood the benefits of CareFirst's Maryland health insurance policies and, crucially, understood that they were available only to Maryland residents.

38.     But the Rappaports knew there were out-of-state, and even overseas, individuals who would be willing to pay them to have access to CareFirst's comprehensive policies available only to Maryland residents.

39.     To receive this coverage, however, these potential members needed to have Maryland residences, or at least, they needed to *appear* to have Maryland residences, to qualify for the policies. This is where the Rappaports' network came into play.

<u>The Property Network</u>

40.     The Rappaports utilized numerous entities (including non-profits and religious organizations), business associates, and family members who owned or controlled residences in Maryland to house (or at least appear to house) the non-resident subscribers.

41.     The scope of the Rappaports' scheme is evident from the patterns they used to implement it. For example, the Rappaports repeatedly listed the same properties as the "residence" for numerous unrelated and unaffiliated clients. Importantly, according to applications filed by the

Rappaports, ***all*** of these families (up to 21 in the case of one property) were residing in the same small places, at the same time, even as ***none*** of them were ostensibly receiving medical care in Maryland. For example:

    a. Avraham sold Maryland policies to at least 21 subscribers who listed their address as 3915 Bancroft Road, Baltimore, MD 21215. Those 21 subscribers amassed 473 claims in 2022, ***all*** of which were for providers outside of Maryland, Virginia, and the District of Columbia.

    b. Avraham sold Maryland policies to at least 14 subscribers who listed their address as 6012 Wallis Road, Baltimore, MD 21215. Those 14 subscribers amassed 302 claims in 2022, ***all*** of which were for providers outside of Maryland, Virginia, and the District of Columbia.

    c. Avraham sold Maryland policies to at least 10 subscribers who listed their address as 3907 W. Strathmore Ave., Baltimore, MD 21215. Those 10 subscribers amassed 655 claims in 2022. Less than 10% of the payments for those claims were for treatment in Maryland.

    d. Between approximately 2019 and 2022, Avraham sold policies to at least 58 subscribers with addresses at the same ten side-by-side duplex houses located at the corner of Park Heights Ave. and Taney Ave. in Baltimore. CareFirst paid claims amounting to $11.3 million for 44 of those subscribers.

    e. Avraham sold policies with an effective date of January 1, 2018, or later to at least 12 subscribers who listed their address as 6619 Park Heights Ave., Baltimore, MD 21215. CareFirst paid $1.07 million in claims for these subscribers, $1.03 million of which was for care outside of CareFirst's service area. Four of the unrelated subscribers even listed the same phone number on their applications.

42. Many of the addresses used in the Rappaports' scheme were owned or controlled by the Rappaports, their family, or close business associates.

43. For example, the Rappaports applied for two different policies for out-of-state subscribers listing a house owned by Rappaports' father as the out-of-state subscribers' "residence" on their policy applications.

44.     Eliezer Rappaport participated in both sides of the scheme, sometimes as a "residence" owner and sometimes as an insurance broker and, at least in one case, as both simultaneously.

45.     Eliezer is the broker of record on an insurance application for a subscriber with a listed "Residence Address" at a property on Edenvale Road in Baltimore County, Maryland. According to public records, this residence is owned by Eliezer himself. The billing address on this application (i.e., where bills and payments for claims would be sent) does not list Eliezer's address. Instead, the billing address is in Jackson Township in Ocean County, New Jersey—a more than a four-hour drive from Baltimore.

46.     The Rappaports have public connections to this part of New Jersey. For example, Jacob Rappaport, who recently pleaded guilty to bank fraud, recently posted on social media seeking assistance for associates and family in Lakewood, New Jersey, a neighboring town to Jackson Township.

<u>The Fraudulent Claims</u>

47.     In addition to the suspiciously large number of claims being submitted by "residents" of the same cluster of Rappaport-controlled properties, the Rappaports' clients typically only utilized their policies during short, intense periods in which they incurred large claims for high-end medical treatment—and then disappeared, cancelling their policies and ceasing to pay premiums to CareFirst. The timing of the policy applications and the dates of these clients' first claims is evidence of an orchestrated fraud scheme.

48.     There are two important "dates" used in insurance billing that are important to understand here. The first is a policy's "effective date." As the name suggests, the "effective date" is the date on which coverage begins under the policy.  A "service date" refers to the date that

10

some type of medical treatment covered by the policy actually occurs. For example, a policy might have an "effective date" of January 1, but if a subscriber waits until February 15 for their annual physical, then February 15 would be the first "service date" under the policy.

49. The Rappaports' clients all have first "service dates" that are suspiciously close to their policy's "effective dates," in some cases occurring the *same day* as the policy's "effective date." And, as indicated above, these "services" are atypical of ordinary care, reflecting high-end medical treatments or treatments for rare and unusual conditions.

50. The proximity of the first "service date" to the "effective date" of the policy for the fraudulent policies sold by the Rappaports reinforces the intentionality and coordinated nature of the scheme. For a subscriber to be treated on the same day their policy went into effect indicates that arrangements for the services had already been made when the Rappaports submitted the fraudulent applications on their behalf.

51. These policies also racked up unusually high numbers of claims, unusually high-dollar-value claims, or both. For example, 152 claims were made on one Eliezer-sold policy in less than one year, resulting in $51,485 in claims paid. And this is just for *one* of the policies "sold" by the Rappaports. This pattern persists across the fraudulently-procured policies.

52. As described above, the Rappaports' clients disproportionately and, in many cases, exclusively submitted claims for treatments outside of Maryland.

53. For example, in the case of the policy in which Eliezer was both broker and landlord, *100%* of the claims made under the policy were for treatments performed in Lakewood, New Jersey—far outside of CareFirst's service area. Indeed, all but three of the claims submitted under this policy were for services provided in Lakewood, New Jersey.

54.     One of the principal service providers for claims submitted under the Lakewood policy were for an entity called Aim High Therapy LLC, which appears to have operated only for a short time and is now permanently closed. The business address for Aim High Therapy LLC was not, as one might expect, a commercial address. Rather, it was a private residential address in Lakewood, New Jersey.

55.     This is not the only policy exhibiting this pattern of submitting claims exclusively for treatments performed outside of Maryland. In fact, to the extent that CareFirst has been able to ascertain that the claimed services were in fact performed, they tend to be performed anywhere *but* Maryland, in states like California, New York, New Jersey, and Florida.

56.     The Rappaports' clients also had a strong tendency to "reside" in Maryland—and pay their insurance premiums—only for the specific time period in which they were submitting these high-value, out-of-state claims to CareFirst.

57.     After CareFirst approved the coverage, the Rappaports—through their network— would arrange to fly them all over the country to receive costly, high-end medical care. Most of these subscribers received coverage outside of CareFirst's exclusive service area in Maryland, D.C., and northern Virginia.

58.     The beneficiaries of the scheme would pay premiums just long enough to have active coverage during these medical procedures. Once the procedures were complete, they would cancel their policies, cease making payments to CareFirst, and disappear back to wherever they actually resided outside of Maryland.

59.     As far as CareFirst can ascertain—and as Rappaport admitted during an investigation by the Maryland Insurance Administration ("MIA") —many of these individuals went back to their countries of origin.

12

The "B.T." Case

60.    Avraham Rappaport referenced his connections with international organizations in his statements to the MIA.

61.    Avraham reported to the MIA that "many of [his] clients [came] from abroad (Israel)" and were referred to him "by some organizations in Israel." These organizations put these individuals in touch with Rappaport "specifically for their health insurance needs."

62.    The MIA forensic examination of Avraham's laptop uncovered numerous, encrypted documents as evidence of the Rappaports' fraud.

63.    These documents included completed insurance application packages for foreign individuals, copies of their non-U.S. passports, utility bills from addresses abroad (including in foreign languages), and copies of visas to the United States.

64.    Avraham's interaction with one of his clients, named "B.T." in the MIA consent order, illustrates how the Rappaports' scheme worked with individual clients.

65.    Avraham first assisted "B.T." in applying for a CareFirst policy in 2021, listing one of his preferred properties, located at 3525 Taney Rd. in Baltimore, as B.T's "residence."

66.    At the time, according to policy applications submitted by Avraham, "B.T." and their family were not the only individuals to reside at 3525 Taney Rd. In fact, that same address was used as the "residence" for at least two other, unrelated clients, all of whom had overlapping coverage and service periods from late 2021 through 2023. Much like the Rappaports' other clients, these three clients submitted numerous, high-value claims to CareFirst in a short period of time, causing CareFirst to pay nearly $700,000 in fraudulent claims on just these three policies.

67.    By this time in 2022, however, CareFirst had begun to investigate some of the Rappaports' clients, even if CareFirst did not yet understand the extent of the Rappaports' scheme.

13

68. On July 6, 2022, CareFirst, sent a letter to Avraham Rappaport, as B.T.'s broker, challenging B.T.'s listed "residence" of 3525 Taney Rd. and asking for confirmation of B.T.'s residency in Maryland. The letter indicated that B.T.'s policy would be rescinded if proper residency documentation was not submitted to CareFirst.

69. Upon receiving this correspondence, Rappaport immediately reached out to another, unnamed person, demanding to know "who is the family that lives at this address [of 3525 Taney Rd.]?" Rappaport's email also said that if CareFirst's concerns were not resolved "there may be massive issues."

70. CareFirst's concerns were not resolved in a timely fashion and CareFirst did, in fact, rescind the policy. B.T. appealed that policy and it is here that Avraham's role as coordinator of the scheme becomes clear.

71. Shortly after filing the appeal, B.T. reached out to Rappaport by email for assistance. Rappaport instructed B.T. to call him rather than respond in writing. A calendar invite on Avraham's laptop indicates that this call took place. Immediately after the call with Rappaport, and apparently at his direction, B.T. purchased a template lease agreement from an online website.

72. Then B.T. sent a letter to CareFirst attempting to prove their Maryland residency. Attached to this letter was a "lease" printed on the template that B.T. had just purchased, stating that B.T. actually lived at a different address in Silver Spring, Maryland.

73. This "lease" contained multiple red flags. First, it was backdated to make it appear that B.T. had actually lived in Silver Spring at the time their policy application was submitted to CareFirst. Second, and more tellingly, the address B.T. put on the residential lease form was *not* a residential address. Rather, the address is for a religious center in Silver Spring.

14

74.     B.T.'s submission of the fake lease was obviously a ruse, concocted by Avraham, to get CareFirst not to rescind its coverage.  In B.T.'s initial application, Avraham listed 3525 Taney Rd., a property he had used for other applications, as their address. It was only when challenged by CareFirst that Rappaport directed B.T. to falsely claim a different (non-residential) address as their residence in communications to CareFirst.

75.     The circumstances of B.T.'s statements and correspondence with Avraham and CareFirst indicate that Avraham directed B.T. on ways to evade CareFirst's controls to fraudulently procure health insurance coverage.

76.     This is just an illustrative example and in no way comprises the full scope of the Rappaports' direction of fraudulent communications from their clients to CareFirst.

### The Rappaports' Cut

77.     Relying on the trust afforded to them as licensed insurance brokers, and with nothing on their face suggestive of fraud, CareFirst approved the Rappaports' fraudulent applications.

78.     The Rappaports earned commissions on the sale of these fraudulently-procured policies to the tune of hundreds of thousands of dollars, which does not include money earned off the books from the subscribers.

79.     In sum, the Rappaports intentionally made false representations about the their clients' residences to CareFirst to (i) secure health insurance coverage for their clients that their clients were ineligible to receive, (ii) obtain commission payments from CareFirst for "selling"

these fraudulent policies, and (iii) upon information and belief, secure payments (i.e., kickbacks) from their clients for assisting them in obtaining CareFirst policies.

CareFirst's Losses

80.     To date, CareFirst has identified at least 259 subscribers to whom the Rappaports "sold" CareFirst's Maryland health insurance policies, but who did not actually qualify for coverage under such policies.

81.     CareFirst has identified at least 19,632 claims for medical coverage it has paid for those 259 subscribers, resulting in total fraudulent claims payments of $51,173,007.41.

**D.     The Rappaports' Scheme Involved Numerous Predicate Offenses Affecting Interstate and International Commerce**

82.     The Rappaports' scheme was interstate and even international in character, involving individuals and entities from across the country and even abroad. For example, as described above and as Avraham Rappaport admitted to the MIA, many of his clients were not U.S. citizens at all and traveled here from overseas specifically at the Rappaports' direction to before submitting fraudulent insurance claims to CareFirst. Many others were located in the United States but not, as they and the Rappaports claimed, in Maryland.

83.     The Rappaports' scheme, by its nature, involved numerous fraudulent wire transfers and bank transfers. These fraudulent transfers violate numerous federal laws, several of which are well-known predicate offenses under the Racketeer Influenced and Corrupt Organizations Act.

84.     Specifically, the Rappaports' use of interstate wires to transfer funds to and from CareFirst, the non-resident insureds, and others to perpetrate the fraud against CareFirst constitutes federal Wire Fraud, in violation of 18 U.S.C. § 1343. Hundreds of such fraudulent transfers

16

occurred in the period between 2017, when Rappaport first began his scheme, and 2023, when CareFirst terminated its relationship with Rappaport as a result.

85.     The Rappaports' scheme also involved numerous mailings associated with the applications for, receipt of, and confirmation of the insurance policy coverage for the non-Maryland residents. The use of mail to effectuate his scheme constitutes numerous violations of the federal Mail Fraud statute, 18 U.S.C. § 1341.

86.     Upon information and belief, Rappaports' scheme must also have involved violations of federal laws pertaining to: fraud on financial instructions (to obtain up front financing for his fraudulent scheme and in connection with the purchase and maintenance of the properties listed as "residences"), falsification or misrepresentation of immigration documents for non-citizen and foreign residents for whom the Rappaports fraudulently obtained CareFirst policies, among other state and federal offenses.

**E.      The Rappaports' Scheme Involved a Complex and Well-Resourced Enterprise**

87.     The Rappaport machine relied extensively on the support of other individuals, entities, and organizations, all acting in close coordination at the direction of the Rappaports.

88.     For example, as Avraham admitted to the MIA, the Rappaports relied on overseas organizations to refer clients to them. It appears that other organizations in the United States performed a similar service with respect to U.S.-based, but out-of-state, clients.  The broad reach of the Rappaports' scheme is evidence of a complex enterprise through which the Rappaports perpetrated their years-long fraud against CareFirst.

89.     Moreover, once the Rappaports' clients obtained insurance coverage, it appears that other individuals and entities became involved to support them during the time they were

submitting claims to CareFirst. These other individuals and entities provided transportation and material support to the Rappaports' clients.

90.    The fact that the Rappaports were able to put this international scheme into action at all speaks to the existence of an enterprise larger than the Rappaports themselves.

**F.    CareFirst's Investigation into Rappaport**

91.    As discussed above, CareFirst had no reason to suspect that the Rappaports' scheme was fraudulent for years after they began to implement it.

92.    CareFirst offered (indeed, it continues to offer) the policies that the Rappaports' targeted to the public. which CareFirst is proud to offer to Marylanders. CareFirst thus *expected* Maryland-based subscribers to use the policy. The fact that some subscribers were doing so in a concentrated area or that some subset of them were submitting claims for high-end procedures was not necessarily indicative of fraud.

93.    It was not until the volume and nature of the claims submitted began to rise that CareFirst began to suspect something was amiss.

94.    Even so, in early CareFirst's investigation had not revealed any direct evidence of fraud. It was not until the second half of 2022, that CareFirst's investigation began to piece together the material elements of the Rappaports' scheme. For example, at this time, in late 2022, CareFirst first conclusively identified that the unusual claims were being submitted largely by policies submitted by certain brokers: the Rappaports.

95.    Once CareFirst made this determination, its investigation began to pick up but it took months, even years of work, without access to the type of investigative tools utilized by state regulators like the MIA for CareFirst to pull together sufficient pieces of the puzzle to understand the massive scale of the fraud being perpetrated against it by the Rappaports. The Rappaports'

international connections and the extent of the property network they were utilizing took many months to discover.

96.     The Rappaports were also engaging in concrete efforts to conceal their fraud. As discussed above, when CareFirst challenged some of the policies fraudulently procured by the Rappaports, they engaged in deliberate efforts to mislead CareFirst and hide their misconduct. These efforts were sometimes effective and, in any event, involved further illegal and fraudulent acts by the Rappaports or committed at their direction.

97.     Indeed, it was not until the MIA's consent order with Avraham Rappaport was published that CareFirst understood even some of the scale of the Rappaports' fraud.

98.     But that investigation was focused on Avraham; CareFirst needed to conduct further investigation to uncover the familial connection or the Rappaports' connections with other individual and entities.

99.     CareFirst continues to investigate the Rappaports' enterprise to ascertain the full scope of the fraud perpetrated against it by the Rappaports and their network, which appears to implicate numerous other individuals, entities, non-profits, and other organizations.

## COUNT I
### Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)
### 18 U.S.C. § 1962(c)
### (Against All Defendants)

100.     CareFirst realleges and incorporates by reference paragraphs 1 to 99 as if fully stated herein.

101.     Under RICO, it is unlawful for (1) any culpable person to (2) conduct an "enterprise" (3) affecting interstate commerce (4) through a "pattern" (5) of "racketeering activity." 18 U.S.C. § 1962(a).

19

102.    **Culpable person.** RICO defines a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Avraham Rappaport and Eliezer Rappaport hold legal or beneficial interests in property. Indeed, defendants have used such interests to conduct their unlawful schemes and direct an enterprise engaged in an unlawful pattern of racketeering activity.

103.    **Enterprise.** The statutory term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "enterprise" for purposes of 18 U.S.C. § 1961 may consist of a "union or group of individuals associated in fact although not a legal entity." Such an "associated-in-fact enterprise" consists of "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Starr v. VSL Pharmaceuticals, Inc.*, 509 F. Supp. 3d 417, 436 (D. Md. 2020) (quoting *Boyle v. United States*, 556 U.S. 938, 944-45 (2009)). An "associated-in-fact" enterprise "must have certain structural features consisting of: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*

104.    The Rappaports' enterprise consists of multiple individuals and legal entities acting together to effectuate their interstate and international fraud scheme against CareFirst. Aside from the familial relationship between defendants Avraham Rappaport and Eliezer Rappaport, the enterprise enlisted participation from numerous members of the community, including charities, and religious organizations, to connect non-Maryland clients with the Rappaports, provide the Rappaports with the information necessary to effectuate the fraud, and submit claims to CareFirst for treatments performed outside of Maryland. The purpose of this enterprise was to fraudulently charge CareFirst for healthcare services that the applicants could not lawfully receive, the

20

individuals involved were linked by familial, social, and commercial relationships, and the enterprise conducted its activities over a period of several years.

105. **Interstate commerce**. A RICO enterprise is involved in "interstate commerce" when it is itself "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce." *United States v. Robertson*, 514 U.S. 669, 672 (1995). The Rappaports' enterprise involved procuring health insurance by fraud on behalf of individuals in different states, facilitating payments using the means of interstate commerce for medical treatments received in multiple states.

106. **Pattern.** The "heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 154 (1987) (Court's emphasis). RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

107. As described above, the Rappaports' scheme involved hundreds of fraudulent insurance applications submitted to CareFirst. These fraudulent applications resulted in thousands of fraudulent claims, and the correspondence attendant thereto, between ineligible persons and CareFirst. Each fraudulent application submitted by the Rappaport enterprise thus involved numerous individual acts of Wire Fraud and Mail Fraud, both of which are well-established predicate offenses sufficient to establish a pattern of racketeering activity.

108. **Wire Fraud & Mail Fraud.** "Mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 have two essential elements: (1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). There is ample evidence of the Rappaports' extensive scheme to defraud CareFirst using numerous false statements to procure insurance policies for

individuals ineligible to receive them. The Rappaports repeatedly and knowingly made false statements on insurance policy applications on behalf of non-Maryland residents to receive insurance coverage that the Rappaports, as licensed insurance brokers in Maryland with a longstanding relationship with CareFirst, knew the individuals were ineligible to receive.

109. Unlike some other fraud schemes that involve only incidental use of the mails or wire communications, the Rappaports used mail and wire communications as the primary vehicle for committing their fraud against CareFirst. The Rappaports made false statements to CareFirst by mail and through wire communications on hundreds of occasions during the years their scheme was in effect.

110. Moreover, to the extent that the Rappaports' scheme involved the transmission of insurance claims based on the fraudulent applications, Rappaports and their co-conspirators caused the mails and wire communications to be used numerous times in connection with their scheme against CareFirst.

111. **Other Predicate Offenses.** The Rappaports sponsored applications to CareFirst for insurance coverage on behalf of individuals from other countries, namely Israel, so that those foreign individuals could receive insurance coverage only available to Maryland residents. The Rappaports facilitated these individuals' entry into the United States under false pretenses. Up until October 19, 2023, Israeli citizens were required to obtain a visa to travel to the United States. By all appearances, the individuals working with the Rappaports made material false statements about the purposes of their visit and their residence address in the United States, in violation of 18 U.S.C. § 1546. Violation of 18 U.S.C. § 1546 is a RICO predicate offense. 18 U.S.C. § 1961. The Rappaports aided and abetted these violations of the law, and thus, pursuant to 18 U.S.C. § 2, are themselves guilty of additional, substantive RICO predicate offenses.

112.   Defendants engaged in a pattern of racketeering activity dating back to, at least, 2017 and continuing through 2023.

113.   This pattern of racketeering activity consisted of massive conspiracy to defraud CareFirst by submitting fraudulent applications to obtain insurance coverage for ineligible individuals who did not reside in the State of Maryland as required for these individuals to qualify for the policies.

114.   **Injury.** The offenses committed against CareFirst were part of an organized pattern of activity occurring hundreds of times over several years from 2017 through 2023.

115.   Defendants' unlawful conduct resulted in CareFirst incurring more than $50 million in losses due to claims paid to ineligible subscribers on the basis of the fraudulent applications written, sponsored, and submitted by Defendants.

116.   Defendants received significant commissions and fees from CareFirst for "selling" these fraudulently-procured policies, in addition to kickbacks and other payments from the members themselves.

117.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT II**
**RICO Conspiracy**
**18 U.S.C. § 1962(d)**
**(Against All Defendants)**

118.    Plaintiff restates and incorporates herein by reference Paragraphs 1 to 99 as if fully set forth herein.

119.    Defendants have intentionally conspired and agreed to violate 18 U.S.C. § 1962(c), as described in Count I, which Plaintiff adopts and incorporates as if fully set forth herein.

120.    Defendants have intentionally conspired and agreed to conduct, facilitate, and otherwise participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts of mail and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to facilitate their cash discount fraud scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

121.    The evidence of Defendants intentional agreement and conspiracy to violate 18 U.S.C. § 1962(c) is evident in the specific nature and pattern of the violations. As discussed above, Defendant Avraham Rappaport first engaged in the scheme to defraud CareFirst by submitting fraudulent applications for ineligible subscribers and then taking direct action to ensure that payments to those ineligible subscribers were made for services they had arranged in advance of their applications.

122.    Defendant Eliezer Rappaport appears to have joined his brother and engaged in a carbon copy of his brother's wrongful conduct against CareFirst using his own address. The Rappaports publicly tout the closeness of their "family" businesses, which appear to extend into unlawful conduct. The fact that the Rappaports share business addresses linked to their insurance

brokerages—the vehicle they used for their offenses—reinforces the existence of a conspiracy to violate RICO.

123.    As alleged above, numerous other persons and entities participated in the RICO conspiracy. The Rappaports relied on multiple property owners, service providers, charities, and overseas referrers to create a pipeline for out-of-state and overseas individuals to get CareFirst to pay their claims for high-end medical treatment.

124.    As a direct and proximate result of Defendants' agreement to facilitate the conspiracy, the contemplated racketeering acts in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiff has been injured in its business and property. Defendants' scheme cost Plaintiff more than $50 million in claims paid based on their long-running fraudulent conduct. But for the Rappaports' wrongful conduct, Plaintiff would not have paid these claims to ineligible subscribers and suffered these damages.

125.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT III
### Breach of Contract
### (Against Avraham and Eliezer Rappaport)

126.    Carefirst realleges and incorporates by reference Paragraphs 1 to 99 as if fully stated herein.

127.    As detailed above, the Rappaport Agreements required the Rappaports to confirm the eligibility of those applying for enrollment in CareFirst's Maryland health insurance policies, to comply with all Federal, State, and local laws in the sale of CareFirst's policies, and to follow CareFirst's requirements, standards, and procedures.

128.    The Rappaport Agreements also required the Rappaports to indemnify CareFirst against any "claims, loss, damage, injury, expense and liability arising out of" the Broker Agreements. "Damages subject to indemnification" under the Broker Agreements include, but are not limited to, compensatory, punitive, costs and attorney fees."

129.    The Rappaports breached the Broker Agreements in several ways, including by:

a. Failing to confirm the eligibility of the subscribers for whom they submitted applications for CareFirst's Maryland health insurance policies;

b. Selling CareFirst's Maryland health insurance policies to subscribers who did not qualify for such policies;

c. Fraudulently concealing the sale of CareFirst's Maryland health insurance policies to subscribers who did not qualify for such policies from CareFirst;

d. Otherwise conducting CareFirst's business in violation of Federal, State, and local laws, and of CareFirst's policies, requirements, and procedures; and

e. Failing to indemnify CareFirst for the losses, damages, and injuries it incurred as a result of his misconduct.

130.    The Rappaports' breaches caused CareFirst to incur substantial losses, including: (i) in excess of $50 million related to claims CareFirst paid on the Subscribers' behalf, (ii) in the form of commission payments it paid to the Rappaports, and (iii) in the form of attorneys' fees in connection with investigation of CareFirst's losses and the filing of this lawsuit.

131.    By way of their breaches of the Broker Agreements, the Rappaports are liable to CareFirst in an amount equal to the measure of losses caused by their breaches of their contracts with CareFirst.

132.    CareFirst demands judgment against the Rappaports for damages in an amount excess of $50 million, plus interest, costs, in an amount to be determined at trial and for other such relief as this Court deems necessary and just.

## COUNT IV
### Fraud / Intentional Misrepresentation
### (Against Avraham and Eliezer Rappaport)

133.    CareFirst realleges and incorporates by reference Paragraphs 1 to 99 as if fully stated herein.

134.    As detailed above, Avraham and Eliezer Rappaport submitted hundreds of fraudulent applications for CareFirst's Maryland health insurance policies on behalf of individuals who did not actually qualify for such policies.

135.    The Rappaports intentionally misled CareFirst into providing health insurance coverage to the subscribers by falsely stating on their insurance applications that they were residents of the State of Maryland, including by listing Maryland addresses on applications for subscribers who did not actually reside in Maryland.

136.    The Rappaports knew that the insurance applications he submitted for the subscribers were false and misleading at the time the applications were submitted to CareFirst.

137.    The Rappaports made these false and misleading statements with the intention of defrauding CareFirst into providing health insurance coverage to the subscribers and paying him commissions in connection with the policies CareFirst issued.

138.    Given the obligations the Rappaports undertook by way of the Broker Agreements, CareFirst reasonably relied on the misrepresentations the Rappaports made to it when he submitted applications for the non-qualifying individuals.

27

139.   As a result of the Rappaports' intentionally fraudulent conduct, CareFirst suffered damages in excess of $50 million.

140.   CareFirst seeks punitive damages in connection with the Rappaports' fraudulent conduct.

141.   CareFirst demands judgment against Avraham and Eliezer Rappaport for damages in an amount excess of $50 million, plus punitive damages, interest, costs, in an amount to be determined at trial and for other such relief as this Court deems necessary and just.

## COUNT V
### Breach of Fiduciary Duty
### (Against Avraham and Eliezer Rappaport)

142.   CareFirst realleges and incorporates by reference Paragraphs 1 to 99 as if fully stated herein.

143.   The Rappaports, as agents authorized to sell CareFirst's Maryland health insurance policies, were accountable to CareFirst as fiduciaries. As approved agents and fiduciaries, the Rappaports owed CareFirst a duty of care to act with reasonable prudence in carrying out their business relationship, a duty of honesty, a duty of disclosure, and a duty of good faith and fair dealing.

144.   The Rappaports breached these duties owed to CareFirst by, among other things, submitting fraudulent applications to CareFirst for subscribers who did not qualify for CareFirst's Maryland health insurance policies, failing to disclose his improper sale of CareFirst's Maryland health insurance policies, and by collecting substantial premiums from CareFirst based on their improper sale of CareFirst's Maryland health insurance policies

145.   CareFirst seeks punitive damages against the Rappaports based on their fraudulent conduct and willful breaches of their fiduciary duties.

146. As a result of the Rappaports' breaches of their fiduciary duties, CareFirst suffered losses in excess of $50 million.

147. CareFirst demands judgment against the Rappaports for damages in excess of $50 million, plus interest, costs, and for other such relief as this Court deems necessary and just.

**COUNT VI**
**Unjust Enrichment**
**(Against Avraham and Eliezer Rappaport)**

148. CareFirst realleges and incorporates by reference Paragraphs 1 to 99 as if fully stated herein.

149. As set forth above, CareFirst conferred direct benefits on the Rappaports by paying them commissions under the Rappaport Agreements in connection with the improper sale of CareFirst's Maryland health insurance policies to the ineligible subscribers.

150. The Rappaports retained those benefits knowing their conduct was unlawful.

151. The Rappaports have thus been unjustly enriched at CareFirst's expense.

152. Retention by the Rappaports of the benefits conferred upon them by CareFirst would be inequitable.

153. CareFirst demands judgment against the Rappaports for damages in excess of $50 million, plus interest, costs, and for other such relief as this Court deems necessary and just.

**JURY DEMAND**

CareFirst demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, CareFirst requests the Court enter a judgment as follows:

1. Declaring that Defendants are liable to CareFirst on each cause of action asserted herein;

29

2. Enjoining Defendants from engaging in further wrongful conduct against Plaintiff;

3. Awarding actual damages in excess of $50 million to Plaintiff;

4. Awarding treble damages pursuant to 18 U.S.C. § 1964(c) for Counts I and II;

5. Awarding punitive damages for Counts IV and V;

6. Awarding interest, costs, and attorneys' fees to Plaintiff; and

7. Any other relief the Court deems just and proper.

Date: June 15, 2026                                    Respectfully submitted,

                                                       **STEIN MITCHELL BEATO & MISSNER LLP**

                                                       */s/ William D. Sinnott*
                                                       Robert B. Gilmore (*pro hac vice* forthcoming)
                                                       Philip J. O'Beirne (*pro hac vice* forthcoming)
                                                       Kevin L. Attridge (MD Bar No. 1012140029)
                                                       Megan A. Benevento (MD Bar No. 1612130043)
                                                       William D. Sinnott (MD Bar No. 2601211004)
                                                       STEIN MITCHELL BEATO & MISSNER LLP
                                                       2000 K Street, N.W., Ste. 600
                                                       Washington, D.C. 20006
                                                       Tel: 202-737-7777
                                                       rgilmore@steinmitchell.com
                                                       pobeirne@steinmitchell.com
                                                       kattridge@steinmitchell.com
                                                       mbenevento@steinmitchell.com
                                                       wsinnott@steinmitchell.com

                                                       *Counsel for Plaintiff CareFirst of Maryland, Inc.*