**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

~~CareFirst of Maryland, Inc.~~ *

*

*

~~Plaintiffs,~~

*

~~v.~~ ~~Case No.:~~

*

~~AVRAHAM RAPPAPORT, ELIEZER RAPPAPORT, and JOHN DOES 1-20~~ * ~~Jury Trial Demanded~~

*

~~Defendants.~~ *

**CAREFIRST OF MARYLAND, INC.,** *

*Plaintiff,* *

v. *

**AVRAHAM RAPPAPORT, ELIEZER RAPPAPORT, YAAKOV RAPPAPORT, PREMIER FINANCIAL, PREMIER FINANCIAL, LLC, PREMIER FINANCIAL, LLC, ZED INVESTMENT GROUP, LLC, LAIBEL KIMELMAN, AARON PINCHOS RABINOWITZ, BALTIMORE BIKUR CHOLIM, INC., MICHAEL SNIDER, CONGREGATION KAHAL CHASSIDIM, INC., CONGREGATION KEDUSHAS YISROEL, INC., NOAM MILLROD, REDSTAR REALTY GROUP LLC, 3960 DOLFIELD AVE LLC, 2611 BOONE ST LLC, 3813 BELLE AVE LLC, JEREMY LANGNER, ARL HOLDINGS II LLC, 3219 CLIFTMONT AVE LLC, FRAN KASTEN, SORA KASTEN, NESANEL KOSTELITZ, BLUMA KOSTELITZ,**

**Case No.: 26-cv-2391-ABA**

**Jury Trial Demanded**

**NER ISRAEL RABBINICAL COLLEGE, INC., THE ORTHODOX CONGREGATION OF SILVER SPRING, INC., SILVER SPRING JEWISH CENTER, INC., YAAKOV GREINIMAN, SANDY GREINIMAN, ELIYA KRANZ, CHAIM MILLMAN, LEIBA MILLMAN, MENACHEM BARON, MORIAH BEHAVIORAL HEALTH CO., IGNITE TEEN TREATMENT, LLC, EDEN TREATMENT, LLC, and JOHN DOES 1–20**

*Defendants.*

* * * * * * * * * * * * * *

## AMENDED COMPLAINT

Plaintiff CareFirst of Maryland, Inc. ("CareFirst"), by and through its undersigned attorneys, hereby bringbrings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, as well as state law causes of action, against Defendants Avraham Rappaport, Eliezer Rappaport, and their co-conspirators, John Does 1-20, and state as follows:Yaakov "Jacob" Rappaport, Premier Financial, Premier Financial , LLC, Premier Financial, LLC, Zed Investment Group LLC, Laibel Kimelman, Aaron Pinchos Rabinowitz, Baltimore Bikur Cholim, Inc. dba Bikur Cholim of Baltimore, Michael "Mordechai" Snider, Congregation Kahal Chassidim, Inc., Noam Millrod, Red Star Realty Group, LLC, 3960 Dolfield Ave, LLC, 2611 Boone St, LLC, 3813 Belle Ave, LLC, Jeremy Langner, ARL Holdings II, LLC, 3219 Cliftmont Ave, LLC, Fran Kasten, Sora Kasten, Nesanel Kostelitz, Bluma Kostelitz, Ner Israel Rabbinical College, Inc. dba Yeshivas Ner Yisroel, The Orthodox Congregation of Silver Spring, Inc., Silver Spring Jewish Center, Inc., Yaakov Greiniman, Sandy Greiniman, Chaim Millman, Leiba Millman, Menachem "Mendi" Baron, Moriah Behavioral Health Co., Ignite Teen Treatment, LLC, and Eden Treatment, LLC. Plaintiff states as follows:

## NATURE OF THE CASE

1. CareFirst of Maryland, Inc., a non-profit health insurance provider based in Baltimore, Maryland, is the victim of a health insurance fraud conspiracy of breathtaking scale and audacity.

2. For years, ~~beginning in 2018 but not known to CareFirst until late 2022,~~ Avraham Rappaport, an insurance broker based in Olney, Maryland, and his brother Eliezer Rappaport (the "Rappaports"), stood at the forefront of an international conspiracy, involving numerous others ranging from medical providers to community organizations to religious institutions to wealthy individuals seeking cheaper healthcare, to defraud CareFirst and cause CareFirst losses of more than $~~50~~66 million.

3. Utilizing fraudulent statements, fake identities~~, fake~~ and residences, fraudulent residency documents, an international network of referrals, and the assistance of numerous individuals and ~~numerous~~ entities, the Rappaports coordinated an international insurance-fraud machine. In doing so, the Rappaports and their co-conspirators directly committed or directed others to commit numerous violations of federal and state law to both effectuate and conceal their illegal activities.

4. The Rappaport machine's goal was simple: to get CareFirst to pay out claims to the Rappaports' overseas and out-of-state clients for ~~high-end~~ medical treatments ~~that~~for which the Rappaports knew those clients were ineligible to receive coverage from CareFirst. The Rappaports achieved this by submitting fraudulent insurance policy applications that falsely claimed the Rappaports' clients were Maryland residents.

5. CareFirst has offered health insurance policies created exclusively for the benefit of Maryland residents, which allow Maryland residents to receive generous coverage for services

anywhere in the United States. Under these policies, for example, if a Maryland resident covered by the policy needed to receive treatment from a top specialist for a rare condition in California, that treatment would be covered by CareFirst. The Rappaports' scheme took advantage of this aspect of CareFirst's business.

6. The Rappaports understood that there was a market outside of Maryland and even abroad for CareFirst's nationwide coverage available to Maryland residents. To manufacture the appearance of Maryland residency for their clients, the Rappaports utilized a network of property owners, service providers, charities, and overseas referrers to create a pipeline for out-of-state and overseas individuals to get CareFirst to pay their clients' claims for high-end medical treatment.

7. The Rappaports' network utilized a series of properties in the Baltimore area owned or controlled by the Rappaports and their associates, which they listed as their clients' Maryland "residence" on insurance coverage applications. The Rappaports did this hundreds of times over the course of multiple years. When they were challenged, the Rappaports directed their clients to submit falsified documents to CareFirst as "support" for their fraudulent residency claims. Upon information and belief, the Rappaports also directed and assisted their overseas clients to submit false information in connection with their visa applications to the United States.

8. The Rappaports' scheme relied upon numerous other entities and individuals to provide referrals, transportation, lodging, material support, and documentation to their clients to make the scheme possible and shield it from outside scrutiny. Upon information and belief, some of the entities the Rappaports relied upon were ~~charities and religious~~community organizations. The Rappaports' reliance on these organizations~~, even if they were not knowing participants,~~ served to lend legitimacy to the Rappaports' illegal conduct and shield it from scrutiny.

9. Thus, Whether the referrals came from community organizations, religious institutions, mental health or addiction treatment centers, or private citizens, it was known that the Rappaports and their network would assist ineligible, non-Maryland residents in obtaining CareFirst's generous coverage by fraud and assist in concealing that fraud from CareFirst.

9.10. The Rappaport enterprise was an intricate, international conspiracy that caused losses in excess of $5066 million to CareFirst, and netted the enterprise hundreds of thousands of dollars in commissions from CareFirst for "selling" these fraudulent policies. Upon information and belief, the Rappaports also received compensation from the out-of-state subscribers for submitting the fraudulent applications on their behalf.

10.11. The Rappaport conspiracy is thus not a small-scale, one- or two-off healthcare fraud. For the conspiracy to work—as it surely did—it required many individuals, entities, and organizations, to work in concert at the direction of the Rappaports.

11.12. Indeed, it seems that fraud has become something of a family tradition for the Rappaports. Shortly before this Complaint was filed, the Rappaports' other brother, Defendant Jacob Rappaport, pleaded guilty to bank fraud related to real estate transactions in Baltimore.

12.13. The Rappaport conspiracy against CareFirst was successful. There can be no doubt about that. The Rappaports caused CareFirst to pay more than $5066 million to out-of-state individuals under policies reserved for Maryland residents, even as the Rappaports reaped large commissions from CareFirst for "selling" those fraudulent policies.

14. The Rappaports' The Rappaports and their co-conspirators took active steps to conceal their activities from CareFirst and others investigating their misconduct through the use of fraudulent documents and repeated, knowing misrepresentations to CareFirst and investigative authorities. It took well into 2023 for CareFirst to understand properly that it was the victim of

fraud, as evidenced by CareFirst's continued payments through mid-2023 on claims submitted to CareFirst stemming from fraudulent applications.

15. CareFirst was not alone in investigating the Rappaports. When CareFirst began to suspect, at the end of 2022, that at least some sort of misconduct was afoot, it promptly reported those concerns to investigative authorities. CareFirst, as a private insurer, lacked the necessary powers to understand the wrongdoing committed against it. But even the Maryland authorities, with all of the numerous powers at their disposal, required the better part of a year to unpack the Rappaports' operation, overcome the Rappaports' layers of deception, and uncover their fraud.

~~13.~~16. In sum, the Rappaport enterprise's insurance fraud scheme is precisely the type of conspiracy that the RICO statute was designed to combat. CareFirst seeks relief under this statute for the multitude of injuries the Rappaports and their co-conspirators inflicted upon it.

## PARTIES

~~14.~~17. Plaintiff CareFirst of Maryland, Inc. is a not-for-profit corporation and provider of health insurance products to consumers. CareFirst is registered in Maryland and headquartered in Baltimore, Maryland. CareFirst employs more than 3,500 individuals in the State of Maryland and provides insurance coverage to millions of people, most of whom reside in its primary service area in Maryland, the District of Columbia, and Virginia.

~~15.~~18. Defendant Avraham Rappaport ("Avraham") resides in Montgomery County, Maryland. Avraham was, during the conduct described in this Complaint, a licensed insurance broker in Maryland. ~~Upon information and belief,~~ Avraham's insurance brokerage license was revoked by the Maryland Insurance Administration, largely because of the misconduct alleged in this Complaint.

~~16.~~19. Defendant Eliezer Rappaport ("Eliezer") resides in Baltimore County, Maryland. Upon information and belief, Eliezer is a registered financial advisor. He was also at some point during the events described herein, a licensed insurance broker in Maryland. ~~Upon information and belief,~~ Eliezer's insurance brokerage license was suspended, largely because of the misconduct described in this Complaint.

20. Defendant Yaakov "Jacob" Rappaport ("Jacob") resides in Baltimore County, Maryland. Jacob was, during the conduct described in this Complaint, an attorney in Maryland. In April 2026, Jacob pleaded guilty to one count of Conspiracy to Commit Bank Fraud.[1] Jacob caused or permitted properties affiliated with him to be used in furtherance of the Rappaport enterprise's illegal conduct.

21. Defendant Premier Financial ("Premier Partnership") is a Maryland unincorporated partnership whose partners are Avraham Rappaport, Eliezer Rappaport, and Yaniv Natanov. Defendant Premier Financial, LLC ("Premier LLC 1") is a Maryland limited liability company with its principal office in Howard County, Maryland, and whose resident agent is Jacob Rappaport. Defendant Premier Financial, LLC ("Premier LLC 2," together with Premier Partnership and Premier LLC 1, "Premier" or the "Premier Entities") is a Maryland limited liability company with its principal office in Howard County, Maryland, and whose resident agent is Yaniv Natanov. The Premier Entities are each other's alter egos and successors which the Rappaports used in furtherance of their enterprise, including, *inter alia*, as the public front for the enterprise and to employee individuals to submit fraudulent applications on the Rappaports' behalf.

[1] *See United States v. Jacob Rappaport*, 26-cr-96 (D. Md. 2026); U.S. Att'y's Off. for the Dist. Of Md., *Towson Attorney Sentenced for Role in Real Estate Bank Fraud Scheme* (June 23, 2026), https://www.justice.gov/usao-md/pr/towson-attorney-sentenced-role-real-estate-bank-fraud-scheme.

22. Defendant Zed Investment Group, LLC ("Zed") is a Maryland limited liability company with its principal office in Baltimore County, Maryland, whose Resident Agent is Jacob Rappaport.

23. Defendant Laibel Kimelman ("Kimelman"), upon information and belief, resides in the State of Israel.

24. Defendant Aaron "Pinchos" Rabinowitz ("Rabinowitz") resides in Baltimore City, Maryland. Rabinowitz was, at various times during the events described herein, the Executive Director and Director of Clinical and Religious Services for Baltimore Bikur Cholim, Inc.

25. Defendant Baltimore Bikur Cholim, Inc. ("Bikur Cholim") d/b/a Baltimore Bikur Cholim is a Maryland non-stock corporation with its principal office in Baltimore County, Maryland. Bikur Cholim describes its mission to include "providing support services to … people coming from all over the world[.]"

26. Defendant Michael "Mordechai" Snider ("Snider") resides in Baltimore City, Maryland. Snider is a licensed attorney in Maryland. Upon information and belief, Snider is the founder and principal financial backer, through entities controlled by him, of Congregation Kahal Chassidim, Inc.

27. Defendants Congregation Kahal Chassidim, Inc. and Congregation Kedushas Yisroel Inc. are Maryland religious corporations with their principal offices in Baltimore County and Baltimore City, Maryland, respectively. Upon information and belief, Congregation Kahal Chassidim and Congregation Kedushas Yisroel operate as a single organization that is controlled and financed by Snider.

28. Defendant Noam Millrod ("Millrod") resides in Baltimore City, Maryland. Upon information and belief, Millrod is the owner of Red Star Realty Group LLC, 3960 Dolfield Ave LLC, 2611 Boone St LLC, and 3813 Belle Ave LLC.

29. Defendants Redstar Realty Group LLC (a/k/a Red Star Realty Group LLC), 3960 Dolfield Ave, LLC, 2611 Boone St LLC, and 3813 Belle Ave LLC ("the Millrod Entities") are Maryland limited liability companies whose common principal office is in Baltimore City, Maryland, and whose common resident agent is Millrod. Upon information and belief, the Millrod Entities are owned and controlled by Millrod.

30. Defendant Jeremy Marc Langner ("Langner") resides in Ocean County, New Jersey.

31. Defendant ARL Holdings II LLC is a Delaware limited liability company with its principal office in Kings County, New York. Langner is the Maryland resident agent of ARL Holdings II LLC. Upon information and belief, ARL Holdings II LLC is controlled by Langner and caused or permitted its properties to be used in furtherance of the Rappaport enterprise.

32. Defendant 3219 Cliftmont Ave LLC is a Maryland limited liability company with its principal office in Baltimore County, Maryland, and whose resident agent is Langner. Upon information and belief, 3219 Cliftmont Ave LLC is controlled by Langner.

33. Defendant Fran Kasten ("Fran") resides in Baltimore County, Maryland. Fran is the owner of a property on Bancroft Road in Baltimore, Md. (the "Kasten Property") that was used repeatedly in furtherance of the Rappaport enterprise's illegal conduct.

34. Defendant Sora Kasten ("Sora") resides in Kings County, New York, and was, during the events described herein, affiliated with Bikur Cholim. Sora previously resided at the residence owned by Fran Kasten.

35. Defendants Nesanel Kostelitz and Bluma Kostelitz (together, the "Kostelitzes") reside in Baltimore City, Maryland.

36. Defendant Ner Israel Rabbinical College ("NIRC"), a/k/a Yeshivas Ner Yisroel, is a Maryland non-stock corporation and a religious educational institution in Pikesville, Md.

37. Defendants The Orthodox Congregation of Silver Spring, Inc. ("OCSS") and Silver Spring Jewish Center, Inc. ("SSJC"), a/k/a Congregation Ahavas Yisrael, are Maryland religious corporations with their common principal office in Montgomery County, Maryland. According to court filings, OCSS and SSJC are self-disclosed corporate affiliates that "share[] substantially common management" and who, upon information and belief, act as alter egos of one another.

38. Defendants Yaakov Greiniman ("Yaakov") and Sandy Greiniman ("Sandy", together, the "Greinimans") reside in Montgomery County, Maryland. Yaakov is a Rabbi for SSJC and, upon information and belief, exercises control over OCSS.

39. Defendant Eliya "Chaya" Kranz ("Kranz") resides in Montgomery County, Maryland. Kranz, a Rappaport client, is the resident agent of OCSS and is listed among SSJC's leadership.

40. Defendants Chaim Millman ("Chaim") and Leiba Millman ("Leiba") (collectively "the Millmans") reside in Ocean County, New Jersey.

41. Defendant Menachem "Mendi" Baron ("Baron") resides in Howard County, Maryland. Baron is the owner and CEO of Moriah Behavioral Health, Ignite Teen Treatment, and Eden Treatment.

42. Defendant Moriah Behavioral Health Co. ("Moriah") is a Nevada corporation with its registered office in Clark County, Nevada. Baron is Moriah's registered agent, President, and

Chief Executive Officer. Upon information and belief, Moriah was the parent company of Ignite Teen Treatment and Eden Treatment.

43. Defendant Ignite Teen Treatment, LLC ("Ignite") is a Nevada limited liability company with its registered office in Clark County, Nevada. Baron is Ignite's registered agent and Chief Executive Officer.

44. Defendant Eden Treatment, LLC ("Eden," collectively with Moriah and Ignite, the "Moriah Companies") is a Nevada limited liability company with its Maryland principal office in Baltimore City, Maryland. Baron is a manager of Eden.

~~17.~~45. John Does 1–20 are the Rappaports' as-yet unmasked co-conspirators.

## JURISDICTION AND VENUE

~~18.~~46. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under a federal law, the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962, 1964).

~~19.~~47. Personal jurisdiction over Defendants is proper as Avraham and Eliezer Rappaport are citizens of the State of Maryland, reside herein, and reside in this District. The events giving rise to the causes of action in the Complaint also took place in this District.

~~20.~~48. Venue is proper under 28 U.S.C. § 1391 as it is the District where Defendants reside and the District in which a substantial part of the events alleged herein occurred.

## FACTUAL ALLEGATIONS

### A. CareFirst's Business

~~21.~~49. CareFirst is one of the country's largest not-for-profit healthcare organizations. Its service area includes Maryland, Washington, D.C., and portions of northern Virginia.

~~22.~~50. As part of its business, CareFirst offers health benefit plans to individuals residing in the State of Maryland ("Maryland health insurance policies").

~~23.~~51. Among other channels, CareFirst's Maryland health insurance policies are sold through the Maryland Health Benefit Exchange ("MHBE") (a state-based marketplace established in compliance with the Affordable Care Act) directly by CareFirst itself, and, relevant here, by third-party brokers with whom CareFirst contracts to sell its policies. These third-party brokers may sell policies through the MHBE (on the Exchange) or otherwise (off Exchange).

~~24.~~52. Whether sold through the MHBE or not, both Maryland law and CareFirst policy require that individuals seeking insurance coverage under CareFirst's Maryland health insurance policies reside in the State of Maryland. *See, e.g.*, Md. Code, Insurance Art. § 31-108 (establishing that the MHBE shall exist to make qualified health insurance plans available to Maryland residents); COMAR 14.35.07.07 (establishing residency requirements for individuals applying for health insurance on the MHBE).

~~25.~~53.

**B. The Rappaports' Relationship with CareFirst**

~~26.~~54. Avraham Rappaport, the leader of the Rappaport enterprise and chief architect of the conspiracy described herein, was an insurance broker, previously licensed by the State of Maryland to purchase and sell insurance on behalf of companies like CareFirst, both on ~~the MHBE~~ and off the Exchange. Avraham sold hundreds of CareFirst policies. As it turned out, many of the policies Avraham "sold," were to Avraham's out-of-state clients. Avraham knew these clients were ineligible to receive the applied-for policies, yet he provided and submitted knowingly false information to make it appear to CareFirst and Maryland regulators that his clients were eligible to receive the applied-for policies when they were not.

~~27.~~55. Eliezer Rappaport, Avraham's brother, is a financial advisor and was formerly a licensed insurance broker in the State of Maryland. Eliezer was the broker of record on at least one insurance policy application submitted to CareFirst on behalf of an individual who was ineligible to receive the applied-for policy.

~~28.~~56. The Rappaports' business address is 101 E. Chesapeake Avenue, Suite 203, Towson, MD 21286.

~~29.~~57. Upon information and belief, this is also the business address of the financial advisory firm where both brothers worked for at least some time during the relevant period. ~~It is not currently known if this financial advisory firm is or was involved in the Rappaports' insurance fraud enterprise.~~

~~30.~~58. From 2016 to 2023, CareFirst and the Rappaports were parties to agreements governing Avraham's sale of CareFirst's health insurance benefit plans (the "Broker Agreements"). Each agreement includes substantially identical language.

~~31.~~59. The Broker Agreements permitted the Rappaports to sell CareFirst's Maryland health insurance policies both through the MHBE and off the Exchange.

~~32.~~60. The Broker Agreements explicitly required the Rappaports to "accurately and completely facilitate" the enrollment of beneficiaries, and to "verify and confirm the eligibility of all persons applying for enrollment."

~~33.~~61. The Broker Agreements further required the Rappaports to comply with all "Federal, State, and local laws," including the requirements of any Federally- or State-Facilitated Exchanges, and to follow CareFirst's requirements, standards, and procedures, including those in its Agent Administrative Manual and Contractor Code of Ethical Business Conduct and Compliance (the "Code").

~~34.~~62. During the six-year period in which ~~he was~~they were authorized to sell CareFirst's Maryland health insurance policies, the Rappaports sold nearly 1,000 such policies, leading CareFirst to pay out tens of millions of dollars in claims for the beneficiaries of such policies.

~~35.~~63. As shown below, many of the policies the Rappaports sold were part of a carefully orchestrated conspiracy to defraud CareFirst.

**C. The Rappaports' Fraud Scheme**

~~36.~~64. The Rappaports organized a criminal scheme against CareFirst that had a simple goal but required a broad network to implement successfully.

~~37.~~65. CareFirst offers health insurance policies that provide generous nationwide healthcare coverage. Crucially, as required by Maryland law, some of these policies, relevant here, are available exclusively for the benefit of Maryland residents. The relevant policies provide comprehensive, nationwide coverage, allowing Maryland-resident subscribers to receive the medical care they need regardless of whether that care is available in Maryland or out of state.

~~38.~~66. The Rappaports, as licensed Maryland insurance brokers, understood the benefits of CareFirst's Maryland health insurance policies and, crucially, understood that they were available only to Maryland residents.

~~39.~~67. But the Rappaports knew there were out-of-state, and even overseas, individuals who would be willing to pay them to have access to CareFirst's comprehensive policies available only to Maryland residents.

~~40.~~68. To receive this coverage, however, these potential members needed to have Maryland residences, or at least, they needed to *appear* to have Maryland residences, to qualify for the policies. This is where the Rappaports' ~~network~~enterprise came into play.

~~The Property Network~~

69. The Rappaport Enterprise involved numerous members, associates, and co-conspirators, as well as many other unwitting participants. Those with connections sufficiently known to CareFirst to name them in the Amended Complaint are set forth below.

70. ***The Rappaports.*** Avraham was the architect and chief orchestrator of the scheme: the listed broker on hundreds of fraudulent policies, coordinator of coverups, and organizer of much of the property network.

71. Eliezer, also an insurance broker, was involved in the residency fraud for some of the enterprise's clients, submitting fraudulent information to CareFirst in much the same way as Avraham.

72. Jacob, an attorney, recently pleaded guilty to a real estate fraud scheme in federal court. Jacob also participated in the insurance fraud scheme orchestrated by his brothers. For example, one of Jacob's companies, Defendant Zed Investment Group, owned property listed as the residence address for a member who appears to have resided in New York and who received treatment almost exclusively outside of Maryland – largely from Defendant Eden Treatment. CareFirst suffered losses of nearly three-quarters of a million dollars on this fraudulent policy.

73. ***Premier Financial***. Eliezer and Avraham Rappaport were partners at Columbia-based Premier Financial and utilized the company for their insurance fraud operation, listing the company as their primary business address and conducting the fraud through Premier Financial email addresses. Multiple other employees of Premier Financial appear to have inherited insurance policies from the Rappaports when the Rappaports' licenses were revoked and one other employee's email is listed on a fraudulent policy sold by Rappaport. While Premier Financial conducted other business not related to the Rappaports' fraud, nearly half of the value of claims

payments made on Premier Financial-sold policies were made on fraudulent policies sold by the Rappaports. CareFirst is investigating the involvement of other individuals at Premier Financial.

74. ***Laibel Kimelman***. As indicated above, many of the Rappaports' clients were non-U.S. citizens seeking medical care in the United States – on CareFirst's dime. The Rappaports appear to have had multiple referral sources for these clients, but chief among them was an Israeli individual, Laibel Kimelman. Mr. Kimelman acted as an intermediary between Israeli clients seeking health insurance policies to use in the United States and the Rappaports. His contact information is listed on numerous fraudulent policies and he also appears to have been a witness in Avraham's defense in proceedings before the MIA.

75. ***Aaron Pinchos Rabinowitz and Bikur Cholim of Baltimore***. Defendant Pinchos Rabinowitz, a rabbi and executive of community group, Defendant Bikur Cholim of Baltimore, was a major referrer of clients to the Rappaports and, upon information and belief, found and organized residences to be used by the Rappaports' clients as their false "residence" on their insurance applications. Indeed, Bikur Cholim volunteers appear to own or otherwise be connected to many of the residences used as the "residence" address for dozens of fraudulent policies submitted by the Rappaports. In fact, Rabinowitz and Bikur Cholim are, as CareFirst presently understands, the organization most involved in the referral of non-Maryland residents, including non-U.S. citizens, to Rappaport *and* the procurement of addresses to falsely list as these clients' listed "residence" on their insurance applications. Upon information and belief, Bikur Cholim is also funded, in part, by Defendant Michael "Mordechai" Snider.

76. Rabinowitz's involvement was not limited to the referral and residency aspects of the scheme. Rabinowitz assisted the Rappaports in covering up for their clients' residency fraud.

77. For example, when CareFirst began rescinding policies from the Rappaports' clients in July 2022, Rabinowitz personally contacted CareFirst to vouch for the clients' Maryland residency, despite knowing full well that they were not, in fact, residents of the addresses they listed on their applications.

78. ***Fran and Sora Kasten***. Sora Kasten is a Bikur Cholim volunteer who, upon information and belief, arranged for 3915 Bancroft Road in Baltimore to be used as the listed "residence" for 23 members who obtained fraudulent policies. Sora previously resided at 3915 Bancroft before moving to New York. Fran Kasten, Sora's relative, is the owner of 3915 Bancroft.

79. ***Nesanel and Bluma Kostelitz***. Nesanel Kostelitz is a Baltimore-based rabbi and faculty member at the Baltimore Community Kollel, which is associated with Defendant Michael Snider. Nesanel and Bluma Kostelitz are, upon information and belief, associates of Bikur Cholim and are the owners of the property at 3907 W. Strathmore Avenue. This property was used for as many as ten of the fraudulent policies submitted by the Rappaports.

80. ***Kedushas Yisroel Kahal Chassidim of Baltimore and Michael "Mordechai" Snider***. Congregation Kahal Chassidim/Congregation Kedushas Yisroel, is a religious institution in Baltimore founded by Michael "Mordechai" Snider, a Baltimore-area lawyer and leader of the congregation. Congregation Kahal Chassidim owns more than twenty properties in northwest Baltimore that were utilized extensively in the Rappaports' fraud scheme. At least 75 fraudulent policies and more than $15 million in fraudulent claims have been traced to applicants falsely listing properties owned by the Congregation as their "residence," as well as at least one policy listing a property personally owned by Snider and his wife. Snider is the founder and, upon information and belief, is the chief operational backer of the Congregation. Upon information and belief, Snider is also a financial supporter of Defendant Bikur Cholim.

81. ***Ner Israel Rabbinical College (NIRC).*** Ner Israel Rabbinical College is a religious educational institution in Maryland with close ties to the Rappaports, their co-conspirator Noam Millrod, and possibly others. CareFirst is investigating the extent of NIRC's involvement in the scheme, but evidence suggests that NIRC was also involved in referring out-of-state individuals to the Rappaports to obtain Maryland insurance while they listed NIRC-owned addresses as their "residence." Hundreds of claims were made on policies tied to these addresses, all of which were for treatment taking place outside of Maryland, and which amounted to millions of dollars in losses to CareFirst. CareFirst continued to pay claims on the fraudulent policies associated with NIRC through November 2023.

82. ***Noam Millrod***. Noam Millrod was owner, via multiple management and holding companies (Defendants Red Star Realty Group LLC, 3960 Dolfield Ave. LLC, 2611 Boone St. LLC, and 3813 Belle Ave. LLC), of multiple properties used extensively in the Rappaport scheme. The Rappaport clients utilizing Millrod's properties submitted hundreds of claims to CareFirst beginning in mid-2022 and extending well into 2023 for treatments received exclusively outside of Maryland.

83. ***Jeremy Marc Langner***. Jeremy Marc Langner is a resident of Ocean County, New Jersey who assisted the Rappaports in obtaining clients from that area. In addition, Langner, through his holding companies, ARL Holdings II LLC and 3219 Cliftmont Ave LLC, owned and operated properties – and a virtual mailbox – used by Rappaport clients as their listed "residence," in spite of the fact that none of the claims submitted for these clients involved treatment in Maryland. CareFirst incurred losses on these claims into 2023.

84. ***The Orthodox Congregation of Silver Spring/Silver Spring Jewish Center (OCSS/SSJC)***. The Silver Spring Jewish Center was the "residence" listed on one of CareFirst's

clearest examples of fraud: the B.T. case described herein. OCSS/SSJC has had an active role in B.T.'s attempt to conceal the residency fraud from CareFirst.

85. As discussed below, B.T.'s "residence," at 1401 Arcola Rd. in Silver Spring, Maryland, is *not* a residence. Rather, it is the address of OCSS/SSJC. Yet, B.T. submitted multiple lease documents, created in October 2022 and backdated to September 2021 – after CareFirst began questioning her residency – that were signed by the late Rabbi Herzel Kranz, the founder of OCSS/SSJC. Curiously, the day after the lease document listing Herzel Kranz as the landlord was executed electronically, a new lease document was drawn up listing a different individual, Israel Herskowitz (who CareFirst has been unable to positively identify) as the landlord at the same address. The document history of the two fraudulent lease agreements lists the same email address for both "landlords" in the B.T. case.

86. OCSS/SSJC's leadership also appears to be involved in providing Rappaport clients with "residences," including the case of one client who admitted to being a citizen of Israel and who never received treatment in Maryland. The late Rabbi Kranz of the center was the landlord in lease documents submitted to CareFirst for that policy; however, the property was, and still is, owned by Defendant Eliya Kranz. Upon information and belief, this client is related to OCSS/SSJC's current rabbi, Defendant Yaakov Greiniman. Yaakov is believed to be the grandson of Rabbi Kranz and nephew of Defendant Eliya Kranz.

87. Defendants Yaakov and Sandy Greiniman's *residences* were also listed on Rappaport clients' policies – and demonstrate their awareness of the scheme. Until early 2022, the Greinimans lived at 1104 Lamberton Drive in Silver Spring, which two Rappaport clients listed as their "residence" when procuring policies in 2021. After the Greinimans moved to 11522 Monticello Ave in or around April 2022, another Rappaport client listed the Greinmans' *new*

address as their "residence." This pattern of fraudulent policies moving with the Greinmans indicates their knowledge and assent to the scheme.

88. ***Chaim and Leiba Millman***. Chaim and Leiba Millman reached out to Eliezer Rappaport to obtain one of CareFirst's generous policies, despite living out of state.

89. Unlike some of Rappaport's clients, who themselves may not have been aware that their conduct was illegal, the Millmans seem to have sought out Eliezer with the full knowledge that they were involving themselves in a fraudulent enterprise.

90. The Millmans, unlike some other Rappaports clients, are executives at companies in the healthcare industry and have the means to afford coverage in their home state of New Jersey. Instead, in an apparent effort to save money at CareFirst's expense, the Millmans knowingly enlisted Rappaport to help them obtain CareFirst's Maryland-resident-only coverage.

91. CareFirst now believes that the Millmans were fully complicit in the fraud. Eliezer Rappaport admitted that he knew the Millmans were ineligible to receive the policy, and that the Millmans understood the same, in his interview with the MIA. Indeed, it appears the Millmans sought out Eliezer to assist in obtaining a CareFirst policy because they were aware of the Rappaports' enterprise and the Rappaports' willingness to fraudulently obtain insurance policies for non-Maryland applicants.

~~42.~~92. The Rappaports utilized numerous entities (including non-profits and religious organizations), business associates, and family members who owned or controlled residences in Maryland to house (or at least appear to house) the non-resident subscribers.

~~43.~~93. The scope of the Rappaports' scheme is evident from the patterns they used to implement it. For example, the Rappaports repeatedly listed the same properties as the "residence" for numerous unrelated and unaffiliated clients. Importantly, according to applications filed by the

Rappaports, ***all*** of these families (~~up to 21~~at least 23 in the case of one property) were residing in the same small places, at the same time, even as ***none*** of them were ostensibly receiving medical care in Maryland. For example:

a. Avraham sold Maryland policies to at least ~~21~~23 subscribers who listed their address as 3915 Bancroft Road, Baltimore, MD 21215~~.~~, a property owned by Defendant Fran Kasten and associated with Defendant Sora Kasten. Those ~~21~~23 subscribers amassed ~~473~~1,462 claims in 2021 and 2022, ~~***all***~~only ***one*** of which ~~were~~was for ~~providers outside of~~ a provider in Maryland, Virginia, ~~and~~or the District of Columbia. CareFirst paid claims amounting to approximately $986,000 for those subscribers.

b. Avraham sold Maryland policies to at least ~~14 subscribers who listed their address as 6012 Wallis Road, Baltimore, MD 21215. Those 14~~75 subscribers ~~amassed 302 claims in 2022, ***all***~~whose listed addresses were properties owned by Congregation Kahal Chassidim – including a set of ten side-by-side duplexes at the corner of Park Heights Avenue and Taney Avenue in Baltimore. CareFirst paid claims totaling more than $15.8 million, of which ~~were~~$14.9 million was for ~~providers~~care outside of ~~Maryland, Virginia, and the District of Columbia~~CareFirst's service area.

c. Avraham sold Maryland policies to at least 10 subscribers who listed their address as 3907 W. Strathmore Ave., Baltimore, MD 21215, owned by Defendants Nesanel and Bluma Kostelitz. Those 10 subscribers amassed 655 claims in 2022. Less than 10% of the payments for those claims were for treatment in Maryland.

~~d. Between approximately 2019 and 2022, Avraham sold policies to at least 58 subscribers with addresses at the same ten side-by-side duplex houses located at the corner of Park Heights Ave. and Taney Ave. in Baltimore. CareFirst paid claims amounting to $11.3 million for 44 of those subscribers.~~

~~f.~~d. Avraham sold policies with an effective date of January 1, 2018, or later to at least 12 subscribers who listed their address as 6619 Park Heights Ave., Baltimore, MD 21215. CareFirst paid $1.07 million in claims for these subscribers, $1.03 million of which was for care outside of CareFirst's service area. Four of the unrelated subscribers even listed the same phone number on their applications.

e. Through 2023, the Rappaports sold policies to out-of-state individuals who listed their residency in a series of properties on Yeshiva Lane belonging to Ner Israel Rabbinical College. These claims were exclusively made for treatments occurring outside of Maryland and resulted in millions of dollars in losses to CareFirst.

~~44.~~94. As described above, many of the addresses used in the Rappaports' scheme were owned or controlled by the Rappaports, their family, or close business associates.

45.95. For example, the Rappaports applied for two different policies for out-of-state subscribers listing a house owned by Rappaports' father as the out-of-state subscribers' "residence" on their policy applications.

46.96. Eliezer Rappaport participated in both sides of the scheme, sometimes as a "residence" owner and sometimes as an insurance broker and, at least in one case, as both simultaneously.

47.97. Eliezer is the broker of record on an insurance application for a subscriber with a listed "Residence Address" at a property on Edenvale Road in Baltimore County, Maryland. According to public records, this residence is owned by Eliezer himself. As described further below, the billing address on this application (i.e., where bills and payments for claims would be sent) does not list Eliezer's address. Instead, the billing address is in Jackson Township in Ocean County, New Jersey – a more than a four-hour drive from Baltimore. for a separate set of co-conspirators, Defendants Chaim and Leiba Millman, who approached Eliezer in the hope of procuring a CareFirst policy that would allow them to save money on their insurance costs. Eliezer assisted the Millmans in submitting a fraudulent insurance application, to which they billed tens of thousands of dollars in claims until their policy was rescinded in March 2023.

48. The Rappaports have public connections to this part of New Jersey. For example, Jacob Rappaport, who recently pleaded guilty to bank fraud, recently posted on social media seeking assistance for associates and family in Lakewood, New Jersey, a neighboring town to Jackson Township.

The Fraudulent Claims

50.98. In addition to the suspiciously large number of claims being submitted by "residents" of the same cluster of Rappaport-controlled properties, the Rappaports' clients

typically only utilized their policies during short, intense periods in which they incurred large claims for high-end medical treatment—and then disappeared, cancelling their policies and ceasing to pay premiums to CareFirst. The timing of the policy applications and the dates of these clients' first claims is evidence of an orchestrated fraud scheme.

~~51.~~99. There are ~~two~~three important "dates" used in insurance billing that are important to understand here. The first is a policy's "effective date." As the name suggests, the "effective date" is the date on which coverage begins under the policy. A "service date" refers to the date that some type of medical treatment covered by the policy actually occurs~~.~~, while the "paid date" refers to the date that CareFirst actually paid out a claim made under a specific policy. For example, a policy might have an "effective date" of January 1, but if a subscriber waits until February 15 for their annual physical, then February 15 would be the first "service date" under the policy. If CareFirst makes a payment to a service provider or to the policy holder for that treatment on November 15 of that year, then November 15 would be the "paid date" for that specific claim.

~~52.~~100. The Rappaports' clients all have first "service dates" that are suspiciously close to their policy's "effective dates," in some cases occurring the *same day* as the policy's "effective date." And, as indicated above, these "services" are atypical of ordinary care, reflecting high-end medical treatments or treatments for rare and unusual conditions.

~~53.~~101. The proximity of the first "service date" to the "effective date" of the policy for the fraudulent policies sold by the Rappaports reinforces the intentionality and coordinated nature of the scheme. For a subscriber to be treated on the same day their policy went into effect indicates that arrangements for the services had already been made when the Rappaports submitted the fraudulent applications on their behalf.

54.102. These policies also racked up unusually high numbers of claims, unusually high-dollar-value claims, or both. For example, 152 claims were made on one Eliezer-sold policy in less than one year, resulting in $51,485 in claims paid. through the end of 2022. And this is just for *one* of the policies "sold" by the Rappaports. This pattern persists across the fraudulently-procured policies., resulting in claims paid well into 2023.

55.103. As described above, the Rappaports' clients disproportionatelyoverwhelmingly and, in many cases, exclusively submitted claims for treatments outside of Maryland.

56. For example, in the case of the Millman policy in which Eliezer was both broker and "landlord,," ***100%*** of the claims made under the policy were for treatments performed in Lakewood, New Jersey—far outside of CareFirst's service area. Indeed, all but three of the claims submitted under thisthe Millman policy were for services provided in Lakewood, New Jersey.

57.104. One of the principal service providers for claims submitted under the Lakewood policy were for an entity called Aim High Therapy LLC, which appears to have operated only for a short time and is now permanently closed. The business address for Aim High Therapy LLC was not, as one might expect, a commercial address. Rather, it was a private residential address in Lakewood, New Jersey.

58.105. This is not the only policy exhibiting this pattern of submitting claims exclusively for treatments performed outside of Maryland. In fact, to the extent that CareFirst has been able to ascertain that the claimed services were in fact performed, they tend to be performed anywhere *but* Maryland, in states like California, New York, New Jersey, and FloridaFlorida, and, for certain types of mental health and addiction treatment, Florida, Nevada, Colorado, and California.

59. The Rappaports' clients also had a strong tendency to "reside" in Maryland—and pay their insurance premiums—only for the specific time period in which they were submitting these high-value, out-of-state claims to CareFirst.

106. The Rappaports' reach was broad. One CareFirst member, a New York resident whose policy was rescinded, reported that an addiction treatment clinic in Florida had actually referred Rappaport to her to assist in obtaining health insurance coverage from CareFirst—coverage that, of course, required her to list a Maryland address. Rappaport apparently assisted her in that, listing one of his preferred fraudulent addresses: the property tied to Defendants Sora and Fran Kasten at 3915 Bancroft Road in Baltimore. Upon information and belief, the member had never set foot at this property, received no treatments in Maryland, and has no connection to Maryland other than the fact that they had a Maryland insurance policy sold to them by the Rappaports. CareFirst made payments on this policy through the end of 2022 and continued to receive claims for payment into 2025.

60.107. After CareFirst approved the coverage, the Rappaports—through their network—would arrange to fly them all over the country to receive costly, high-end medical care. Most of these subscribers received coverage outside of CareFirst's exclusive service area in Maryland, D.C., and northern Virginia.

61.108. The beneficiaries of the scheme would pay premiums just long enough to have active coverage during these medical procedures. Once the procedures were complete, they would cancel their policies, cease making payments to CareFirst, and disappear back to wherever they actually resided outside of Maryland.

~~62.~~109. As far as CareFirst can ascertain—and as Rappaport admitted during an investigation by the Maryland Insurance Administration ("MIA") —many of these individuals went back to their countries of origin.

~~The "B.T." Case~~

~~64.~~110. Avraham Rappaport referenced his connections with international organizations in his statements to the MIA.

~~65.~~111. Avraham reported to the MIA that "many of [his] clients [came] from abroad (Israel)" and were referred to him "by some organizations in Israel." These organizations put these individuals in touch with Rappaport "specifically for their health insurance needs."

~~66.~~112. The MIA forensic examination of Avraham's laptop uncovered numerous, encrypted documents as evidence of the Rappaports' fraud.

~~67.~~113. These documents included completed insurance application packages for foreign individuals, copies of their non-U.S. passports, utility bills from addresses abroad (including in foreign languages), and copies of visas to the United States.

~~68.~~114. Avraham's interaction with one of his clients, named "B.T." in the MIA consent order, illustrates how the Rappaports' scheme worked with individual clients.

~~69.~~115. Avraham first assisted "B.T." in applying for a CareFirst policy in 2021, listing one of his preferred properties, located at 3525 Taney Rd. in Baltimore and owned by Congregation Kahal Chassidim, as B.T's "residence."

~~70.~~116. At the time, according to policy applications submitted by Avraham, "B.T." and their family were not the only individuals to reside at 3525 Taney Rd. In fact, that same address was used as the "residence" for at least two other, unrelated clients, all of whom had overlapping coverage and service periods from late 2021 through 2023. Much like the Rappaports' other

clients, these three clients submitted numerous, high-value claims to CareFirst in a short period of time, causing CareFirst to pay nearly $700,000 in fraudulent claims on just these three policies.

~~71.~~117. By this time~~,~~ in the summer of 2022, however, CareFirst had begun to investigate claims submitted by some of the Rappaports' clients, even if CareFirst did not yet understand ~~the extent of the Rappaports' scheme.~~that it had been defrauded or suffered any losses due to fraud.

~~72.~~118. On July 6, 2022, CareFirst, sent a letter to Avraham Rappaport, as B.T.'s broker, ~~challenging B.T.'s listed "residence" of 3525 Taney Rd. and~~ asking for ~~confirmation of~~proof to confirm B.T.'s residency ~~in~~ at her listed Maryland~~.~~ "residence" of 3525 Taney Rd. The letter indicated that B.T.'s policy would be rescinded if proper residency documentation was not submitted to CareFirst.

~~73.~~119. Upon receiving this correspondence, Rappaport immediately reached out to another, unnamed person, demanding to know "who is the family that lives at this address [of 3525 Taney Rd.]?" Rappaport's email also said that if CareFirst's concerns were not resolved "there may be massive issues."

~~74.~~120. ~~CareFirst's concerns were not resolved in a timely fashion and CareFirst did, in fact, rescind the policy. B.T. appealed that policy and it is here that Avraham's role as coordinator of the scheme becomes clear.~~According to records uncovered in 2023 by the Maryland Insurance Administration's investigation into Rappaport, which CareFirst could not have uncovered itself, Rappaport assisted B.T. in deceiving CareFirst about her residency.

~~75.~~121. Shortly after filing the appeal, B.T. reached out to Rappaport by email for assistance. Rappaport instructed B.T. to call him rather than respond in writing. A calendar invite

on Avraham's laptop indicates that this call took place. Immediately after the call with Rappaport, and apparently at his direction, B.T. purchased a template lease agreement from an online website.

76.122. Then B.T. sent a letter to CareFirst attempting to prove their Maryland residency. Attached to this letter was a "lease" printed on the template that B.T. had just purchased, stating that B.T. actually lived at a different address, 1401 Arcola Rd., in Silver Spring, MarylandMd.

123. This "lease" contained multiple red flags. First, it wasCareFirst initially accepted the lease as proof, but sent follow-up letters in October 2022 to the Arcola Road address in Silver Spring for B.T., to which she never responded and which were returned unopened.

77.124. First, it turns out the "lease" submitted by B.T. was not genuine and had been backdated to make it appear that B.T. had actually lived in Silver Spring at the time their policy application was submitted to CareFirst. Second, and more tellingly, the address B.T. put on the residential lease form was ***not*** a residential address. Rather, it was the address is for a religious center inof Defendants The Orthodox Congregation of Silver Spring and Silver Spring Jewish Center.

78.125. B.T.'s submission of the fake lease was obviously a ruse, concocted by Avraham, to get CareFirst not to rescind its coverage. In B.T.'s initial application, Avraham listed 3525 Taney Rd., a property he had used for other applications, as their address. It was only when challenged by CareFirst that Rappaport directed B.T. to falsely claim a different (non-residential) address belonging to a co-conspirator, The Orthodox Congregation of Silver Spring, as their residence in communications to CareFirst.

~~79.~~126. The circumstances of B.T.'s statements and correspondence with Avraham and CareFirst indicate that Avraham directed B.T. on ways to evade CareFirst's controls to fraudulently procure health insurance coverage.

~~80.~~127. This is just an illustrative example and in no way comprises the full scope of the Rappaports' direction of fraudulent communications from their clients to CareFirst.

~~The Rappaports' Cut~~

~~84. Relying on the trust afforded to them as licensed insurance brokers, and with nothing on their face suggestive of fraud, CareFirst approved the Rappaports' fraudulent applications.~~

~~85.~~ The Rappaports ~~earned commissions on the sale of these fraudulently-procured~~ also routinely conspired with healthcare providers and facilities to sell additional CareFirst policies to ~~the tune of hundreds of thousands of dollars, which does not include money earned off the books from the subscribers.~~

~~86. In sum, the Rappaports intentionally made false representations about the their clients' residences to CareFirst to (i) secure health insurance coverage for their clients that their clients~~ individuals who were ineligible ~~to receive, (ii) obtain commission payments from CareFirst for "selling" these fraudulent~~ for those policies~~, and (iii) upon information and belief, secure payments (i.e., kickbacks) from their clients for assisting them in obtaining CareFirst policies.~~

~~CareFirst's Losses~~

~~88.~~128. ~~To date, CareFirst has identified at least 259 subscribers to whom~~ due to not being bona fide Maryland residents. This included providers and facilities referring their

patients to the Rappaports for insurance, as well as the Rappaports "sold" CareFirst's Maryland health insurance policies, but who did not actually qualify for coverage under such policiesreferring clients to providers and facilities.

129. As mentioned above, one subscriber from New York was referred to the Rappaports by employees at an addiction treatment center in Florida.

130. Another example is Menachem "Mendi" Baron and his businesses: Moriah Behavioral Health, Ignite Teen Treatment, and Eden Treatment (collectively "Moriah").

131. Between June 2019 and January 2023, Moriah submitted nearly 1,300 claims to CareFirst has identified for 25 patients, causing CareFirst to pay at least 19,632 claims for medical coverage it has paid for those 259$4.39 million to Moriah. This does not include claims made by individual providers who treated — or at least *purported to treat* — Rappaport clients while living in Ignite and Eden facilities.

132. Rappaport subscribers, resulting in total made up an outsized proportion of Moriah patients. For example, when Ignite's facility first opened in 2018, it had beds for **eight** patients. Rappaport subscribers occupied up to **seven** of Ignite's beds at various times and continuously occupied, from January 2020 to March 2021, more than 50% of Ignite's beds.

133. CareFirst's investigation has uncovered no connections between Moriah patients with Rappaport policies and Maryland.

134. Baron conspired with the Rappaports to receive business from, or direct business to, the Rappaports for the mutual benefit of the Rappaport enterprise and Moriah.

135. Baron and Moriah's conspiracy with the Rappaports did not merely cause CareFirst to pay millions in fraudulent claims payments of $51,173,007.41. Indeed, it enabled Moriah to prolong its abuse, neglect, and harm towards its patients. As one former employee described

online: Baron "puts profit over client care and it is shown." Another former Moriah provider identified abusive practices by Moriah, including staff *physically and sexually assaulting* clients, some of whom were underage. And in the words of a patient who went to Moriah for treatment in 2021 – in the middle of Moriah's fraud against CareFirst: "I feel like I left worse than how I came in."

~~89.~~136. Moriah's abuse of its patients, fueled by its fraud against CareFirst in conspiracy with the Rappaports, finally ended in December 2025 after its licenses were suspended and authorities executed a search warrant on one of its facilities.

**D. The Rappaports' Scheme Involved Numerous Predicate Offenses Affecting Interstate and International Commerce**

~~90.~~137. The Rappaports' scheme was interstate and even international in character, involving individuals and entities from across the country and even abroad. For example, as described above and as Avraham Rappaport admitted to the MIA, many of his clients were not U.S. citizens at all and traveled here from overseas specifically at the Rappaports' direction ~~to~~ before submitting fraudulent insurance claims to CareFirst. Many others were located in the United States but not, as they and the Rappaports claimed, in Maryland.

~~91.~~138. The Rappaports' scheme, by its nature, involved numerous fraudulent wire transfers and bank transfers. These fraudulent transfers violate numerous federal laws, several of which are well-known predicate offenses under the Racketeer Influenced and Corrupt Organizations Act.

~~92.~~139. Specifically, the Rappaports' use of interstate wires to transfer funds to and from CareFirst, the non-resident insureds, and others to perpetrate the fraud against CareFirst constitutes federal Wire Fraud, in violation of 18 U.S.C. § 1343. Hundreds of such fraudulent

transfers occurred in the period between 2017, when Rappaport first began his scheme, and 2023, when CareFirst uncovered the scheme and terminated its relationship with Rappaport as a result.

~~93.~~140. The Rappaports' scheme also involved numerous mailings associated with the applications for, receipt of, and confirmation of the insurance policy coverage for the non-Maryland residents. The use of mail to effectuate his scheme constitutes numerous violations of the federal Mail Fraud statute, 18 U.S.C. § 1341.

~~94.~~141. Upon information and belief, Rappaports' scheme must also have involved violations of federal laws pertaining to: fraud on financial ~~instructions~~institutions (to obtain up front financing for his fraudulent scheme and in connection with the purchase and maintenance of the properties listed as "residences"), falsification or misrepresentation of immigration documents for non-citizen and foreign residents for whom the Rappaports fraudulently obtained CareFirst policies, among other state and federal offenses.

**E. The Rappaports' Scheme Involved a Complex and Well-Resourced Enterprise**

~~95.~~142. The Rappaport machine relied extensively on the support of other individuals, entities, and organizations, all acting in close coordination at the direction of the Rappaports.

~~96.~~143. For example, as Avraham admitted to the MIA, the Rappaports relied on overseas organizations to refer clients to them. It appears that other organizations in the United States performed a similar service with respect to U.S.-based, but out-of-state, clients. The broad reach of the Rappaports' scheme is evidence of a complex enterprise through which the Rappaports perpetrated their years-long fraud against CareFirst.

~~97.~~144. Moreover, once the Rappaports' clients obtained insurance coverage, ~~it appears that other individuals and entities~~the Rappaports' co-defendants became involved to

support them during the time they were submitting claims to CareFirst. These other individuals and entities provided transportation and material support to the Rappaports' clients. In some cases, such as for Defendants associated with Bikur Cholim and the Silver Spring Jewish Center, the Rappaports' co-defendants assisted them in concealing the fraud and making misrepresentations to CareFirst.

97. The fact that the Rappaports were able to put this international scheme into action at all speaks to the existence of an enterprise larger than the Rappaports themselves.

**G.F. CareFirst's Investigation into Rappaportthe Rappaports' Scheme**

98.145. As discussed above, CareFirst had no reason to suspect that the Rappaports' scheme was fraudulent for years after they began to implement it.

99.146. CareFirst offered (indeed, it continues to offer) the policies that the Rappaports' targeted to the public., which CareFirst is proud to offer to Marylanders. CareFirst thus *expected* Maryland-based subscribers to use the policy. The fact that some subscribers were doing so in a concentrated area or that some subset of them were submitting claims for high-end procedures was not necessarily indicative of fraud.

100.147. It was not until the volume and nature of the claims submitted began to rise that CareFirst began to suspect something was amiss.

148. Even so, in early CareFirst's investigation had not revealed any direct evidence of fraud. It was not until the second half of 2022, that CareFirst's investigation began to piece together the material elements of the Rappaports' scheme. For example, at this time, in

101.149. It was not until late 2022, that CareFirst first conclusively identified that the unusual claims were being submitted largely by policies submitted by certain brokers:, namely the Rappaports.

150. Once CareFirst made this determination, its investigation began to pick up but it took months, even years of work, without access to the type of investigative tools utilized by state regulators like the MIA for CareFirst to pull together sufficient pieces of the puzzle to understand the massive scale of the fraud being perpetrated against it by the Rappaports. ~~The Rappaports' international connections and the extent of the property network they were utilizing took many months to discover.~~Even with all of the investigative tools at its disposal, it took the MIA a year to understand the Rappaports' misconduct sufficiently well to revoke the Rappaports' insurance brokerage licenses.

151. For CareFirst, it took substantially longer to understand that it had suffered losses as a result of the Rappoports' actions, losses it continued to incur well into 2023.

~~102.~~152. In late 2022, just as CareFirst was first beginning to tie the Rappaports to some potentially fraudulent applications (but by no means all), CareFirst embarked on an internal project intended to review all duplicate member addresses, in the hope of separating the mistakes from what it now suspected was fraud.

~~103.~~153. The Rappaports were also engaging in concrete efforts to conceal their fraud. As discussed above, when CareFirst challenged some of the policies fraudulently procured by the Rappaports, they engaged in deliberate efforts to mislead CareFirst and hide their misconduct. These efforts were sometimes effective and, in any event, involved further illegal and fraudulent acts by the Rappaports or committed at their direction.

~~104.~~154. Indeed, it was not until the MIA's consent order with Avraham Rappaport was published that CareFirst understood even some of the scale of the Rappaports' fraud.

~~105.~~155. But that investigation was focused on Avraham; CareFirst needed to conduct further investigation to uncover the familial connection or the Rappaports' connections with other individual and entities.

156. ~~CareFirst~~ That investigation has taken many months and continues to ~~investigate~~ the ~~Rappaports' enterprise to ascertain~~present. CareFirst is continually uncovering more evidence on the ~~full~~ scope of the Rappaports' fraud ~~perpetrated against it by~~and uncovering losses of which it was previously unaware.

**G. CareFirst's Losses**

~~106.~~157. To date, CareFirst has identified at least 355 subscribers to whom the Rappaports ~~and their network, which appears to implicate numerous other individuals, entities, non-profits, and other organizations.~~ "sold" CareFirst's Maryland health insurance policies, but who did not actually qualify for coverage under such policies.

158. CareFirst has identified at least 32,510 claims for medical coverage it has paid for those 355 subscribers, resulting in total fraudulent claims payments of $66,723,043.44.

**COUNT I**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**18 U.S.C. § 1962(c)**
**(Against All Defendants)**

~~107.~~159. CareFirst realleges and incorporates by reference paragraphs 1 to ~~99~~157 as if fully stated herein.

~~108.~~160. Under RICO, it is unlawful for (1) any culpable person to (2) conduct an "enterprise" (3) affecting interstate commerce (4) through a "pattern" (5) of "racketeering activity." 18 U.S.C. § 1962(a).

~~109. **Culpable person.** RICO defines a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Avraham~~

Rappaport and Eliezer Rappaport hold legal or beneficial interests in property. Indeed, defendants have used such interests to conduct their unlawful schemes and direct an enterprise engaged in an unlawful pattern of racketeering activity.

110. **Enterprise.** The statutory term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "enterprise" for purposes of 18 U.S.C. § 1961 may consist of a "union or group of individuals associated in fact although not a legal entity." Such an "associated-in-fact enterprise" consists of "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Starr v. VSL Pharmaceuticals, Inc.*, 509 F. Supp. 3d 417, 436 (D. Md. 2020) (quoting *Boyle v. United States*, 556 U.S. 938, 944-45 (2009)). An "associated-in-fact" enterprise "must have certain structural features consisting of: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*

111.161. The Rappaports' enterprise consists of multiple individuals and legal entities acting together to effectuate their interstate and international fraud scheme against CareFirst. Aside from the familial relationship between defendants Avraham Rappaport and Eliezer Rappaport, the enterprise enlisted participation from numerous members of the communityco-defendants, including charities, and religious community organizations, like Bikur Cholim, religious institutions like Congregation Kahal Chassidim, OCSS, SSJC, NIRC, leaders of those organizations and institutions like Michael Snider and Aaron Pinchos Rabinowitz, as well as other, non-institutional sources, such a Laibel Kimelman, the Millmans, and Jeremy Langner, and sometimes even medical providers themselves to connect the Rappaports with their non-Maryland clients with the Rappaports, provide. These co-defendants also provided the Rappaports

with the information necessary to effectuate the fraud, and submit claims to CareFirst for treatments performed outside of Maryland. The purpose of this enterprise was to fraudulently charge CareFirst for healthcare services that the applicants could not lawfully receive;. The individuals involved were linked by familial, social, and commercial relationships, and the enterprise conducted its activities over a period of several years.

112.162. **Interstate commerce**. A RICO enterprise is involved in "interstate commerce" when it is itself "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce." *United States v. Robertson*, 514 U.S. 669, 672 (1995). The Rappaports' enterprise involved procuring health insurance by fraud on behalf of individuals in different states, facilitating payments using the means of interstate commerce for medical treatments received in multiple states.

113. **Pattern.** The "heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 154 (1987) (Court's emphasis). RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

114.163. As described above, The Rappaports' scheme involved hundreds of fraudulent insurance applications submitted to CareFirst. These fraudulent applications resulted in thousands of fraudulent claims, and the correspondence attendant thereto, between ineligible persons and CareFirst. Each fraudulent application submitted by the Rappaport enterprise thus involved numerous individual acts of Wire Fraud and Mail Fraud, both of which are well-established predicate offenses sufficient to establish a pattern of racketeering activity.

115.164. **Wire Fraud & Mail Fraud.** "Mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 have two essential elements: (1) the existence of a scheme to defraud

~~and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006).~~ There is ample evidence of the Rappaports' extensive scheme to defraud CareFirst using numerous false statements to procure insurance policies for individuals ineligible to receive them. The Rappaports repeatedly and knowingly made false statements on insurance policy applications on behalf of non-Maryland residents to receive insurance coverage that the Rappaports, as licensed insurance brokers in Maryland with a longstanding relationship with CareFirst, knew the individuals were ineligible to receive.

165. The Rappaports were not alone in making these misrepresentations, many of which occurred through the mail, or in engaging in interstate financial transactions predicated on fraud. Defendants Aaron Rabinowitz, the Silver Spring Jewish Center, and the Millmans, among others, all engaged in similar misrepresentations through the mail and other means of interstate commerce and communication.

~~116.~~166. Unlike some other fraud schemes that involve only incidental use of the mails or wire communications, the ~~Rappaports~~Rappaport enterprise used mail and wire communications as the primary vehicle for committing their fraud against CareFirst. The Rappaports and their co-defendants made false statements to CareFirst by mail and through wire communications on hundreds of occasions during the years their scheme was in effect.

~~117.~~167. Moreover, to the extent that the Rappaports' scheme involved the transmission of insurance claims based on the fraudulent applications, Rappaports and their co-conspirators caused the mails and wire communications to be used numerous times in connection with their scheme against CareFirst.

~~118.~~168. ~~**Other Predicate Offenses.**~~ The Rappaports sponsored applications to CareFirst for insurance coverage on behalf of individuals from other countries, namely Israel, so

that those foreign individuals could receive insurance coverage only available to Maryland residents. The Rappaports facilitated these individuals' entry into the United States under false pretenses. Up until October 19, 2023, Israeli citizens were required to obtain a visa to travel to the United States. By all appearances, the individuals working with the ~~Rappaports~~Rappaport enterprise made material false statements about the purposes of their visit and their residence address in the United States, in violation of 18 U.S.C. § 1546. Violation of 18 U.S.C. § 1546 is a RICO predicate offense. 18 U.S.C. § 1961. The ~~Rappaports~~Rappaport enterprise aided and abetted these violations of the law, and thus, its members and co-conspirators, pursuant to 18 U.S.C. § 2, are themselves guilty of additional, substantive RICO predicate offenses.

~~119.~~169. Defendants engaged in a pattern of racketeering activity dating back to, at least, 2017 and continuing through 2023~~.~~, when CareFirst discovered the fraud and promptly took steps to shield itself from Defendants' misconduct.

~~120.~~170. This pattern of racketeering activity consisted of massive conspiracy to defraud CareFirst by submitting fraudulent applications to obtain insurance coverage for ineligible individuals who did not reside in the State of Maryland as required for these individuals to qualify for the policies.

~~121.~~171. ~~**Injury.**~~ The offenses committed against CareFirst were part of an organized pattern of activity occurring hundreds of times over several years from 2017 through 2023.

~~122.~~172. Defendants' unlawful conduct resulted in CareFirst incurring more than $~~50~~66 million in losses due to claims paid to ineligible subscribers on the basis of the fraudulent applications written, sponsored, and submitted by Defendants.

~~123. Defendants received significant commissions and fees from CareFirst for "selling" these fraudulently procured policies, in addition to kickbacks and other payments from the members themselves.~~

~~124. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.~~

**COUNT II**
**RICO Conspiracy**
**18 U.S.C. § 1962(d)**
**(Against All Defendants)**

~~125.~~173. Plaintiff restates and incorporates herein by reference Paragraphs 1 to ~~99~~157 as if fully set forth herein.

~~126.~~174. Defendants have intentionally conspired and agreed to violate 18 U.S.C. § 1962(c), as described in Count I, which Plaintiff adopts and incorporates as if fully set forth herein.

~~127.~~175. Defendants have intentionally conspired and agreed to conduct, facilitate, and otherwise participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts of mail and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to facilitate their cash discount fraud scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

~~128.~~176. The evidence of Defendants intentional agreement and conspiracy to violate 18 U.S.C. § 1962(c) is evident in the specific nature and pattern of the violations. As discussed above, Defendant Avraham Rappaport first engaged in the scheme to defraud CareFirst by submitting fraudulent applications for ineligible subscribers and then taking direct action to ensure that payments to those ineligible subscribers were made for services they had arranged in advance of their applications.

~~129.~~177. Defendant Eliezer Rappaport appears to have joined his brother and engaged in a carbon copy of his brother's wrongful conduct against CareFirst using his own address. The Rappaports publicly tout the closeness of their "family" businesses, which appear to extend into unlawful conduct. The fact that the Rappaports share business addresses linked to their

insurance brokerages—the vehicle they used for their offenses—reinforces the existence of a conspiracy to violate RICO.

~~130.~~178. As alleged above, numerous other persons and entities, including the other named Defendants in the manner described herein, participated in the RICO conspiracy. The Rappaports relied on the co-defendants, which include multiple property owners, service providers, ~~charities~~community and religious organizations, and overseas referrers to create a pipeline for out-of-state and overseas individuals to get CareFirst to pay their claims for high-end medical treatment.

~~131.~~179. As a direct and proximate result of Defendants' agreement to facilitate the conspiracy, the contemplated racketeering acts in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiff has been injured in its business and property. Defendants' scheme cost Plaintiff more than $~~50~~66 million in claims paid based on their long-running fraudulent conduct. But for the Rappaports' and Defendants' wrongful conduct, Plaintiff would not have paid these claims to ineligible subscribers and suffered these damages.

~~132. By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.~~

**COUNT III**
**Breach of Contract**
**(Against Avraham and Eliezer Rappaport)**

~~133.~~180. CareFirst realleges and incorporates by reference Paragraphs 1 to ~~99~~157 as if fully stated herein.

~~134.~~181. As detailed above, the Rappaport Agreements required the Rappaports to confirm the eligibility of those applying for enrollment in CareFirst's Maryland health insurance

policies, to comply with all Federal, State, and local laws in the sale of CareFirst's policies, and to follow CareFirst's requirements, standards, and procedures.

~~135.~~182. The Rappaport Agreements also required the Rappaports to indemnify CareFirst against any "claims, loss, damage, injury, expense and liability arising out of" the Broker Agreements. "Damages subject to indemnification" under the Broker Agreements include, but are not limited to, compensatory, punitive, costs and attorney fees."

~~136.~~183. The Rappaports breached the Broker Agreements in several ways, including by:

a. Failing to confirm the eligibility of the subscribers for whom they submitted applications for CareFirst's Maryland health insurance policies;

b. Selling CareFirst's Maryland health insurance policies to subscribers who did not qualify for such policies;

c. Fraudulently concealing the sale of CareFirst's Maryland health insurance policies to subscribers who did not qualify for such policies from CareFirst;

d. Otherwise conducting CareFirst's business in violation of Federal, State, and local laws, and of CareFirst's policies, requirements, and procedures; and

e. Failing to indemnify CareFirst for the losses, damages, and injuries it incurred as a result of his misconduct.

~~137.~~184. The Rappaports' breaches caused CareFirst to incur substantial losses, including: (i) in excess of $~~50~~66 million related to claims CareFirst paid on the Subscribers' behalf, (ii) in the form of commission payments it paid to the Rappaports, and (iii) in the form of attorneys' fees in connection with investigation of CareFirst's losses and the filing of this lawsuit.

~~138. By way of their breaches of the Broker Agreements, the Rappaports are liable to CareFirst in an amount equal to the measure of losses caused by their breaches of their contracts with CareFirst.~~

~~139. CareFirst demands judgment against the Rappaports for damages in an amount excess of $50 million, plus interest, costs, in an amount to be determined at trial and for other such relief as this Court deems necessary and just.~~

**COUNT IV**
**Fraud / Intentional Misrepresentation**
**(Against Avraham and Eliezer Rappaport)**

~~140.~~185. CareFirst realleges and incorporates by reference Paragraphs 1 to ~~99~~157 as if fully stated herein.

~~141.~~186. As detailed above, Avraham and Eliezer Rappaport submitted hundreds of fraudulent applications for CareFirst's Maryland health insurance policies on behalf of individuals who did not actually qualify for such policies.

~~142.~~187. The Rappaports intentionally misled CareFirst into providing health insurance coverage to the subscribers by falsely stating on their insurance applications that they were residents of the State of Maryland, including by listing Maryland addresses on applications for subscribers who did not actually reside in Maryland.

~~143.~~188. The Rappaports knew that the insurance applications he submitted for the subscribers were false and misleading at the time the applications were submitted to CareFirst.

~~144.~~189. The Rappaports made these false and misleading statements with the intention of defrauding CareFirst into providing health insurance coverage to the subscribers and paying him commissions in connection with the policies CareFirst issued.

~~145.~~190. Given the obligations the Rappaports undertook by way of the Broker Agreements, CareFirst reasonably relied on the misrepresentations the Rappaports made to it when he submitted applications for the non-qualifying individuals.

~~146.~~191. As a result of the Rappaports' intentionally fraudulent conduct, CareFirst suffered damages in excess of $~~50~~66 million.

~~147. CareFirst seeks punitive damages in connection with the Rappaports' fraudulent conduct.~~

~~148. CareFirst demands judgment against Avraham and Eliezer Rappaport for damages in an amount excess of $50 million, plus punitive damages, interest, costs, in an amount to be determined at trial and for other such relief as this Court deems necessary and just.~~

**COUNT ~~V~~VI**
**Breach of Fiduciary Duty**
**(Against Avraham and Eliezer Rappaport)**

~~149.~~192. CareFirst realleges and incorporates by reference Paragraphs 1 to ~~99~~157 as if fully stated herein.

~~150.~~193. The Rappaports, as agents authorized to sell CareFirst's Maryland health insurance policies, were accountable to CareFirst as fiduciaries. As approved agents and fiduciaries, the Rappaports owed CareFirst ~~a duty~~duties of: care to act with reasonable prudence in carrying out their business relationship~~, a duty of~~; honesty~~, a duty of~~; disclosure~~,~~; and ~~a duty of~~ good faith and fair dealing.

~~151.~~194. The Rappaports breached these duties owed to CareFirst by, among other things, submitting fraudulent applications to CareFirst for subscribers who did not qualify for CareFirst's Maryland health insurance policies, failing to disclose his improper sale of CareFirst's

Maryland health insurance policies, and by collecting substantial premiums from CareFirst based on their improper sale of CareFirst's Maryland health insurance policies

~~152. CareFirst seeks punitive damages against the Rappaports based on their fraudulent conduct and willful breaches of their fiduciary duties.~~

~~153.~~195. As a result of the Rappaports' breaches of their fiduciary duties, CareFirst suffered losses in excess of $~~50~~66 million.

~~154. CareFirst demands judgment against the Rappaports for damages in excess of $50 million, plus interest, costs, and for other such relief as this Court deems necessary and just.~~

**COUNT ~~VI~~VII**
**Unjust Enrichment**
**(Against Avraham and Eliezer Rappaport)**

~~155.~~196. CareFirst realleges and incorporates by reference Paragraphs 1 to ~~99~~157 as if fully stated herein.

~~156.~~197. As set forth above, CareFirst conferred direct benefits on the Rappaports by paying them commissions under the Rappaport Agreements in connection with the improper sale of CareFirst's Maryland health insurance policies to the ineligible subscribers.

~~157.~~198. The Rappaports retained those benefits knowing their conduct was unlawful.

~~158.~~199. The Rappaports have thus been unjustly enriched at CareFirst's expense.

~~159.~~200. Retention by the Rappaports of the benefits conferred upon them by CareFirst would be inequitable.

~~160. CareFirst demands judgment against the Rappaports for damages in excess of $50 million, plus interest, costs, and for other such relief as this Court deems necessary and just.~~

**JURY DEMAND**

CareFirst demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, CareFirst requests the Court enter a judgment as follows:

1. Declaring that Defendants are liable to CareFirst on each cause of action asserted herein;

2. Enjoining Defendants from engaging in further wrongful conduct against Plaintiff;

3. Awarding actual damages in excess of $5066 million to Plaintiff;

4. Awarding treble damages pursuant to 18 U.S.C. § 1964(c) for Counts I and II;

5. Awarding punitive damages for Counts IV, V, and VVI;

6. Awarding interest, costs, and attorneys' fees to Plaintiff; and

7. Any other relief the Court deems just and proper.

Date: June 16September 28, 2026

Respectfully submitted,

**STEIN MITCHELL BEATO & MISSNER LLP**

*/s/ William D. Sinnott*
*Robert B. Gilmore*

(*pro hac vice* forthcoming)
Robert B. Gilmore (Bar No. 32516)
Philip J. O'Beirne (*pro hac vice* forthcomingBar No. 32530)
Kevin L. Attridge (MD Bar No. 101214002932517)
Megan A. Benevento (MD Bar No. 161213004319883)
William D. Sinnott (MD Bar No. 260121100432533)
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street, N.W., Ste. 600
Washington, D.C. 20006
Tel: 202-737-7777
rgilmore@steinmitchell.com

pobeirne@steinmitchell.com
kattridge@steinmitchell.com
mbenevento@steinmitchell.com
wsinnott@steinmitchell.com

*Counsel for Plaintiff CareFirst of Maryland, Inc.*